

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

### NO. AP-75,796

---

### SELWYN DAVIS, Appellant

### v.

### THE STATE OF TEXAS

---

### ON DIRECT APPEAL FROM CAUSE NO. D-1-DC-06-904119
### IN THE 390TH JUDICIAL DISTRICT COURT
### TRAVIS COUNTY

---

**KELLER, P.J., delivered the opinion of the Court in which MEYERS, WOMACK, KEASLER, HERVEY, and COCHRAN, JJ., joined. PRICE, JOHNSON, and HOLCOMB, JJ., concurred.**

In October 2007, a jury convicted appellant of capital murder.[1] Based on the jury's answers to the special issues,[2] the trial judge sentenced appellant to death.[3] Direct appeal to this Court is

---

[1] See TEX. PENAL CODE § 19.03(a)(2) ("A person commits an offense if the person commits murder as defined under Section 19.02(b)(1) and . . . the person intentionally commits the murder in the course of committing or attempting to commit . . . burglary.").

[2] See TEX. CODE CRIM. PROC. art. 37.071, § 2(b), (e). Unless otherwise indicated, all further references to articles are to the Texas Code of Criminal Procedure.

[3] Art. 37.071, § 2(g).

automatic.[4] After reviewing appellant's twenty-six points of error, we find them to be without merit. Consequently, we affirm the trial court's judgment and sentence of death.

## I. BACKGROUND

On August 22, 2006, appellant entered an apartment without permission through a window and waited for the occupants to return home. The apartment belonged to Regina Lara, who was the mother of appellant's estranged girlfriend, Linda Martinez. Linda's fifteen-year-old daughter, R.M, who lived with Regina, received a ride home from school that day from her aunt, Veronica Lara. When the pair returned to the apartment, R.M. first noticed that her grandmother's cat was missing and then found appellant in her bedroom, but she was too frightened to call out or say anything to her aunt about appellant being in the apartment. Appellant told R.M. that her mother had been beaten by a group of men, and when Veronica left, appellant sexually assaulted R.M. Appellant then instructed R.M. to stay in her room until her grandmother returned home.

When Regina returned home approximately an hour later, R.M. met her in the living room. R.M. did not see appellant anywhere in the apartment. Regina told R.M. that appellant had assaulted her mother and that she was hospitalized. A short time later, R.M. went to the kitchen for a glass of water and noticed that two knives were missing. Worried, she stepped into the hallway outside the apartment to receive better cell phone reception in order to call Veronica. R.M. told Veronica that she was concerned appellant could still be in the apartment and asked her to return to the apartment. Regina stepped into the hallway and told R.M. to come back inside the apartment. Still worried, R.M. asked her grandmother not to go back inside. Regina, however, went back inside the apartment. Several seconds later, R.M. heard Regina scream. R.M. ran to a nearby convenience

---

[4] Art. 37.071, § 2(h).

store to safely call the police.

Appellant attacked Regina and stabbed her several times. She suffered a fractured voice box as a result of strangulation and a fractured skull from a blow to her head. Regina died from multiple stab wounds to the heart.

Appellant fled the scene in Regina's van. He drove to a nearby shopping center, where he entered a Ross Department Store. Sarah Spanier, a friend of Linda Martinez, called 9-1-1 to report that appellant was in the department store, bloody, bandaged, and "not acting right." While there, appellant purchased new clothes and changed into them. Officers later found appellant's discarded clothing and Regina's checkbook in the dressing room he used at the department store.

Spanier followed appellant out of Ross and informed the 9-1-1 operator that appellant had walked into a nearby Target. Several officers, including Officers Robert Broomhall and Robert Caudill, went to the Target store. Upon entering the store, Broomhall quickly located appellant near the electronics department. Broomhall and Caudill were the first officers to approach appellant, and they directed him to turn around and raise his hands. When appellant did not follow the officers' directions, Caudill forced appellant to the ground. Appellant struggled briefly but was quickly subdued and handcuffed. As officers walked appellant to a police car, appellant broke away and attempted to run. Officers quickly apprehended appellant and placed him in the back seat of a police car.

Officer Caudill and Officer Corey Wroblewski transported appellant to Brackenridge Hospital, where he was treated for cuts on his arm and face. Homicide Detective Rogelio Sanchez

read Article 38.22 warnings[5] to appellant at the hospital.  The officers subsequently transported

appellant to the police station's homicide division, where he was interviewed.  The administration

of warnings at the hospital and the interview at the station were electronically recorded (audio only

at the hospital, audio and video at the station).

## II. GUILT

### A. *Batson* Claim

In point of error four,[6] appellant contends that the trial court erred in denying a *Batson*[7]

challenge to the State's peremptory strike of prospective juror Mays, an African-American.

Appellant claims that the "defense rebutted the prosecutor's race-neutral rationale, leaving only the

impermissible rationale for Mays' removal."

*Batson* provides a three-step process for a trial court to use in adjudicating a claim that a

peremptory challenge was based on race:  First, "a defendant must make a prima facie showing that

a peremptory challenge has been exercised on the basis of race."[8]  Second, "if that showing has been

made, the prosecution must offer a race-neutral basis for striking the juror in question."[9]  Finally, "in

light of the parties' submissions, the trial court must determine whether the defendant has shown

---

[5]  *See* Art. 38.22, §2(a)(1)-(5); *see also Miranda v. Arizona*, 384 U.S. 436 (1966).

[6]  Appellant failed to number the points of error presented in his brief.  In its brief, the State numbered the points of error in the order presented within appellant's brief.  We will do the same for the sake of clarity.

[7]  *Batson v. Kentucky*, 476 U.S. 79 (1986).

[8]  *Snyder v. Louisiana*, 552 U.S. 472, 476 (2008).

[9]  *Id.* at 476-77.

purposeful discrimination."[10]

A trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous.[11] The trial court's role in evaluating *Batson* claims is pivotal.[12] Often the best evidence of discriminatory intent is the demeanor of the prosecutor exercising the challenge.[13] Additionally, race-neutral reasons for peremptory challenges often turn on aspects of a venire member's demeanor, such as nervousness or inattention, causing the trial court's observations to be even more important.[14]

The record reflects that prospective juror Mays arrived at the courtroom late for voir dire. Before Mays entered the courtroom, the trial court set out the basic facts surrounding her late arrival:

> For the record, Ms. Mays came into the courthouse this morning. She was carrying – evidently she has a little pocket knife for protection or a knife for protection. The deputies saw it and sent her out. They wouldn't let her leave it. They sent her away, so she went home. A constable went out to find her. We called her work. We've been tracking her down, so she is now here.

Before her individual voir dire, the trial court asked Mays, "I've already put on the record that you were here this morning, but you were turned away by the deputies downstairs. Is that right?" Mays responded, "Uh-huh." The prosecutor then proceeded with individual voir dire. When the prosecutor was done, defense counsel had no questions. After Mays was asked to step outside the courtroom, the trial court asked the parties' whether they had any challenges. Neither party

---

[10] *Id.* at 477.

[11] *Id.*; *Gibson v. State*, 144 S.W.3d 530, 534 (Tex. Crim. App. 2004).

[12] *Snyder*, 552 U.S. at 477.

[13] *Id.*

[14] *Id.*

challenged Mays for cause, but the State chose to exercise a peremptory strike.

When defense counsel raised a *Batson* objection, the prosecutor offered several race-neutral reasons for the strike:

> Number one is what the court put on the record is that when she came to court originally with that knife, the people at the front door gave her the opportunity to, you know, either turn around and leave or leave the knife outside and come in. And instead of notifying the court or putting the knife down somewhere and coming in, she just disappeared. We couldn't find her. The court had to send out a constable to get her. She was due at 10:00 this morning. We came back at 1:00, and she had been obtained from somewhere by the constable's office.
>
> When she came in, she appeared to me to have a little bit – I don't know if it was hostility or annoyance or what at being brought back down here. She did seem to – I think that she calmed down a bit. But I had the impression when she came in that she would hold that against the State at some point.
>
> When I asked her – in addition . . . when I was going through the questions with her whether if the State proved the elements of capital murder to her beyond a reasonable doubt, would she be able to find someone guilty of capital murder, and there was a long pause. And then she finally said, yeah, I could.
>
> The other thing that gave me pause was when I asked her if the death penalty would ever be appropriate. She answered the questions in the questionnaire that wen[t] – number 99, "Do you believe in the death penalty?" And she said it wasn't applicable. And she did say it was because she just hadn't thought about it.
>
> But then when I asked her whether she ever could think of an instance where the death penalty would ever be appropriate, she said first, "I want to say no." And then she thought a little bit about it and she said, "Well, I guess I could think of one."
>
> She said that the death penalty would be appropriate for somebody who continues to kill. In her questionnaire when she answered number 106, she said, "Life in prison is more appropriate for someone convicted of capital murder when they continue to do the same act." When I asked her about that here on the stand, she said, "Yes, if they continue to kill."
>
> So it has nothing to do with her race or her sex or anything else.
>
> She has said that she would consider the death penalty for somebody who continued to kill. And then at first she would – she said she wanted to say no about the death penalty, and then finally said, "Well, if they continue to kill."

So for those reasons, we have moved to strike her.

The record also shows that, before accepting juror Vana, the trial court thanked him for "waiting." "The juror before you did not come in," the trial court said, "and we had to send a constable out to get her." The prospective juror that had to be retrieved was Mays, who had by then arrived.

Defense counsel responded that there was no evidence before the trial court about what "really happened" when Mays was denied entry to the courthouse. Counsel stated that there was "some hearsay back and forth about what happened down there." Counsel pointed out that the State had not actually questioned Mays regarding the events and her feelings about the situation. Counsel asserted that Mays's answers to the prosecutor's questions showed that she wanted to understand and be sure because she had never considered the issues before. After considering the State's reasons and defense counsel's response, the trial court overruled the *Batson* challenge, stating, "The court finds that the State's reasons, based on the demeanor of the potential juror, are racially neutral."

Defense counsel faulted the prosecutor at trial for failing to question Mays about the events surrounding her late arrival to the courthouse, but neither did defense counsel question Mays about those events. Nor did defense counsel introduce any other "nonhearsay" testimony regarding those events. We have no reason to disbelieve the descriptions of events given by the trial court and the prosecutor, and more importantly, we have no reason to doubt the prosecutor's belief in those descriptions. The trial court was in a position to evaluate the demeanor of both the prosecutor and the prospective juror. Given defense counsel's failure to question Mays, we cannot agree with appellant's contention that the defense rebutted the prosecutor's rationale for the strike to the degree required to overturn the trial court's ruling. Because there was ample support in the record for

concluding that the prosecutor had race-neutral reasons for exercising the strike, we conclude that the trial court's ruling was not clearly erroneous. Point of error four is overruled.

## B. Diminished Capacity/Intoxication Defense

### 1. *Evidence*

In his first point of error, appellant alleges that the trial court erred in denying his request "to introduce evidence of an affirmative defense of diminished capacity." During the guilt phase, appellant attempted to present the testimony of psychiatrist Dr. Susan Stone about appellant's substance abuse and the effect it had on him.[15] He sought to use this testimony to negate the *mens rea* of the underlying offense of burglary. On appeal, appellant argues that Dr. Stone's testimony would have shown that appellant did not intentionally commit burglary because he believed that he had permission to be in Regina's home.

Near the close of the State's case, defense counsel reminded the trial court that the defense wished to present Dr. Stone's testimony regarding diminished capacity and requested that the trial court make a ruling in advance. The trial court asked the defense to make a proffer of what the testimony would entail. Defense counsel explained:

> In general, Your Honor, I believe the testimony of Dr. Stone would have to do with the effects of cocaine use, crack cocaine use, and how those effects could relate to the ability for a person to form intent, relate to the ability in terms to control impulse, the ability in terms of inhibition reduction and that would relate to the –

At that point, the trial court stopped defense counsel, and the following exchange took place:

The Court:      This is my problem – go ahead.

[Defense Counsel]:   And mental illness.

---

[15]  Dr. Stone had interviewed appellant and reviewed his records.

| The Court: | What mental illness? |
|---|---|
| [Defense Counsel]: | That's what she would be testifying to. |
| The Court: | But what mental illness?   Unrelated to the cocaine?  Unrelated to the cocaine?  Because everything I'm seeing – |
| [Defense Counsel]: | There is prior medical testimony about schizophrenia in his family. |
| The Court: | No. Him, specifically with him. |
| [Defense Counsel]: | It would be about the drug abuse. |

The trial court ruled: "These cases are squarely on point with mental illness, mental health issues where drug – voluntary drug use has nothing to do with it.  I will not let that evidence in."

There is no such thing as an "affirmative defense of diminished capacity" in Texas (other than insanity),[16] but evidence of a mental disease or defect may be relevant and admissible to rebut or disprove the defendant's culpable *mens rea*.[17]   The present case, however, involves the question of voluntary intoxication, which is governed by a specific statute.

Penal Code § 8.04(a) provides: "Voluntary intoxication does not constitute a defense to the commission of crime."[18]  Intoxication is further defined as a "disturbance of mental or physical capacity resulting from the introduction of any substance into the body."[19]  In *Ramos v. State*, we construed this statute as prohibiting any attempt to use intoxication to rebut or disprove a defendant's

---

[16] *Ruffin v. State*, 270 S.W.3d 586, 593 (Tex. Crim. App. 2008).

[17] *Id.* at 594.  Such evidence may, in a particular case, be excluded under other evidentiary rules, such as Texas Rule of Evidence 403.  *Id.* at 595.

[18] T EX. PENAL CODE § 8.04(a).

[19] *Id.*, § 8.04(d).

*mens rea*.[20]  In that case, as in this one, the defendant contended that "he was intoxicated to such an extent, that he failed to have the requisite intent necessary to commit a burglary."[21]  We held that the defendant's contention was contrary to longstanding Texas law that was recodified by § 8.04 of the Penal Code.[22]  We relied upon *Ramos* and the statute in subsequent cases to reject legal sufficiency claims based upon intoxication,[23] and we explained in *Skinner v. State* that "Texas Penal Code § 8.04(a) bars the use of evidence of voluntary intoxication to negate the culpable mental state of a crime."[24]

Because Dr. Stone's testimony was proffered at the guilt stage of trial[25] to show that appellant's intoxication from cocaine use prevented him from forming the applicable *mens rea*, the evidence was inadmissible.[26]  Point of error one is overruled.

---

[20]  547 S.W.2d 33, 33-34 (Tex. Crim. App. 1977).

[21]  *Id.* at 33.

[22]  *Id.* at 33-34, 34 n.2.

[23]  *Tijerina v. State*, 578 S.W.2d 415 , 416-17 (Tex. Crim. App. 1979); *Hawkins v. State*, 605 S.W.2d 586, 588-89 (Tex. Crim. App. 1980).  *See also Rojas v. State*, 986 S.W.2d 241, 247 (Tex. Crim. App. 1998)("argument that [the defendant's] intoxication made him incapable of forming the necessary intent is not viable under a legal or factual sufficiency analysis").

[24]  956 S.W.2d 532, 543 (Tex. Crim. App. 1997).

[25]  Evidence of intoxication may be introduced at the punishment stage of trial under certain circumstances.  TEX. PEN. CODE § 8.04(b), (c).

[26]  In part of his argument, appellant relies upon the United States Constitution's due process right to have "a meaningful opportunity to present a complete defense."  He acknowledges this right as qualified by the requirement that the evidence be relevant and not excluded by an established evidentiary rule.  In enacting § 8.04, the legislature statutorily barred the use of evidence of intoxication to rebut a defendant's mental culpability.  Appellant never mentions § 8.04 in any portion of his argument, and our reading of his argument suggests that he is not attempting to claim that a statute or evidentiary rule is unconstitutional.  Rather, appellant simply appears to be claiming

(continued...)

## 2. *Jury Instruction*

In point of error nine, appellant alleges that the trial court erred in failing to properly instruct the jury at the guilt phase of trial regarding voluntary intoxication. Appellant complains that he "requested an instruction on voluntary intoxication's effect upon modifying the knowing and intentional performance of the elements of the offense that make the case a capital murder." Incorporating by reference his discussion contained in point of error one, appellant argues that an instruction should have been given because some evidence of his intoxication was presented through his confession and through lay witnesses.

> During discussions regarding the jury charge, defense counsel stated:

> [T]he defense has not made a request for a charge which clarifies, in our view, the law that voluntary intoxication is not a defense as in affirmative defense, insanity, self-defense, *et cetera*, and that the State is still required to show the requisite *mens rea*, and more importantly I think in a capital murder case than any other case, in that voluntary intoxication may, in fact, affect a person's ability to form certain intent. In other words, the murder, regardless of how intoxicated, if intentionally committed, there is no defense there.

> However, if you have elements and prerequisites to the murder becoming a capital murder, that voluntary intoxication could go to and is appropriate to consider whether or not there's a knowing and intentional performance of the elements of the offense that make it a capital murder.

> That's about as unclear as it could be, but I think the court understood when I'm making it. So it's simply we're not making the request for the charge to be changed; we simply are going to argue that point and make reference to the court's charge.

---

[26](...continued)
that Dr. Stone's testimony was admissible because it was relevant and no rule of evidence required its exclusion. Appellant's contention is incorrect because the evidence was rendered legally irrelevant by § 8.04. Even if appellant's argument were construed as a challenge to the constitutionality of the statute, however, the challenge would be without merit. *Montana v. Egelhoff*, 518 U.S. 37 (1996) (upholding the constitutionality of statute that provided that voluntary intoxication "may not be taken into consideration in determining the existence of a mental state which is an element of [a criminal] offense") (bracketed material in *Egelhoff)*.

Fair enough?

The trial court asked defense counsel whether he wanted a ruling, and defense counsel replied, "You did indicate you would deny it." Defense counsel continued, "And on that basis, we are not making a formal request for the charge. What we're doing is we're going to argue based on the charge as it is."

The above colloquy shows that appellant refrained from making an objection and did not obtain a ruling from the trial court. We need not decide whether the appellate complaint before us involves an alleged defensive issue, which would be forfeited entirely by appellant's failure to object,[27] or an alleged defect in the instructions regarding the elements of the offense, which would relegate any error to an analysis under the egregious harm standard.[28] No error occurred here.

With respect to intoxication, the trial court instructed the jury: "Voluntary intoxication does not constitute a defense to the commission of a crime. Intoxication means disturbance of mental or physical capacity resulting from the introduction of any substance into the body." This instruction conforms to Penal Code § 8.04. We have already explained, in connection with appellant's first point of error, that § 8.04 bars a defendant from using evidence of intoxication to challenge his culpable mental state. The trial court gave a proper instruction that says the exact opposite of what appellant now claims he should have received.

Even absent § 8.04, however, appellant would still not be entitled to an instruction. No statute authorizes a defense of intoxication, or a special instruction on the mitigating value of intoxication, with respect to the guilt phase of trial in a capital murder case, nor does any statute

---

[27] *Posey v. State*, 966 S.W.2d 57, 61-63 (Tex. Crim. App. 1998).

[28] *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985).

make the absence of intoxication an element of the offense of capital murder. Absent a statute falling into one of those categories, any instruction suggesting that intoxication can be a defense to a crime would be improper and would constitute a comment on the weight of the evidence.[29] Point of error nine is overruled.

### C. Autopsy Photograph

In point of error six, appellant claims that the trial court erroneously admitted an autopsy photograph of the victim's tongue. At trial, appellant complained that the photograph did "not go to the cause of death." Defense counsel argued that the injuries shown could have occurred "if the ambulance hit a bump in the road" and that "the way it's shown, ripped out of her face and a separate organ, that this is prejudicial and inflammatory in terms of the cause of death." On appeal, appellant contends that the evidence was admitted in violation of Texas Rule of Evidence 403 because "the gruesomeness of this display far outweighs any probative value the evidence might have presented."

Rule 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.[30]

A court may consider many factors in determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice, including: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are in color or black-and-white, whether they

---

[29] *Solomon v. State*, 49 S.W.3d 356, 368 (Tex. Crim. App. 2001) (requested instruction on independent impulse); *Giesberg v. State*, 984 S.W.2d 245, 250 (Tex. Crim. App. 1998) (requested instruction on alibi).

[30] T EX. R. EVID. 403.

are close up, whether the body depicted is clothed or naked, the availability of other means of proof, and other circumstances unique to the individual case.[31] The admissibility of photographs over an objection is within the sound discretion of the trial court.[32] Autopsy photographs are generally admissible unless they depict mutilation of the victim caused by the autopsy itself.[33]

State's Exhibit 139 is a photograph of a cross-section of the victim's tongue which shows hemorrhaging within the tongue. Dr. David Dolinak, the chief medical examiner for Travis County, explained that in the photograph, it looked like the victim had recently bitten her tongue. The bruising, as described by Dr. Dolinak, was deep in the middle part of her tongue and indicated a significant bite. He elaborated that bruising of that nature was commonly present when "somebody has either sustained impact injury of the head or the neck or been strangled. Any time somebody is under duress [or] stress, and force is applied around the jaw or the head, we can see that." Dr. Dolinak stated that while the damage could have resulted from a ligature or a blow to the head, he really "couldn't say."

In order to view the deep bruising inside the victim's tongue, it was necessary that the tongue be cross-sectioned. While Dr. Dolinak did testify that he "couldn't say" that the hemorrhage occurred during the course of the offense, he also testified that such damage is most commonly caused by strangulation or an impact injury to the head or neck. The victim suffered both of these types of injuries. The photograph itself is not excessively gruesome and was necessary to show an

---

[31] *Santellan v. State*, 939 S.W.2d 155, 172 (Tex. Crim. App. 1997); *Long v. State*, 823 S.W.2d 259, 272 (Tex. Crim. App. 1991).

[32] *Sonnier v. State*, 913 S.W.2d 511, 518 (Tex. Crim. App. 1995).

[33] *Santellan*, 939 S.W.2d at 172.

injury not otherwise visible.

Considering all factors, we conclude that the trial court did not abuse its discretion in determining that the probative value of the photograph was not substantially outweighed by its prejudicial effect. Point of error six is overruled.

## D. Confession

### 1. *Background*

After committing the offense, appellant fled to a nearby shopping center, where he was apprehended. Officer Doug Perales, who was involved in appellant's apprehension, was not able to detect that appellant was intoxicated. Officer Wroblewski did not notice that appellant was intoxicated at the time he was apprehended and did not recall appellant appearing like someone who had used crack cocaine or was intoxicated from crack cocaine. According to Officer Broomhall, appellant was very calm and did not smell of alcohol. Broomhall recalled that appellant became more agitated once he was placed into the back seat of the patrol car.

Homicide detective Frank Rodriguez briefly spoke with appellant while he was waiting in the patrol car. Rodriguez checked appellant's injuries, gave appellant water, and called EMS. Rodriguez described appellant as being in an excited state. Rodriguez attributed appellant's state to the recent events and the offense because appellant did not smell of alcohol and did not appear to have been using crack cocaine.

Officers Caudill and Wroblewski transported appellant to the emergency room at Brackenridge Hospital where he was treated for cuts on his arm and face. Homicide detective Rogelio Sanchez arrived at the hospital and read appellant his Article 38.22 warnings from the "standard blue card." Appellant asked the detective to "slow down" because appellant felt that they

"had all the time in the world." Appellant explained: "I don't like the vibes I'm getting from you. I just want you to, you know, relax with me because I'm gonna be trying to feel everything you got inside you, because I'm my own person and I'm gonna be at ease at all times." Detective Sanchez explained that he was trying to expedite the reading of warnings because hospital personnel were ready to stitch appellant up. Appellant replied, "I know my rights, get to your questions." Detective Sanchez then read each of the warnings, one at a time, and asked appellant after each whether he understood the warning in question. Each time, appellant indicated that he understood. Detective Rodriguez, who was also present, observed that appellant seemed agitated when the warnings were read to him. After the warnings were read, Detective Sanchez asked, "Now after you get through being tended here at the hospital, I'd like to take you over to the homicide office for an interview. Is that – is that fine with you? Yes or no?" Appellant replied, "That's fine." Detective Sanchez also informed appellant that he had two outstanding warrants for which he was being arrested.

Detective Sanchez described appellant as conscious, alert, talkative, loud, and receptive to questions. Sanchez did not consider appellant's loudness to be inappropriate; he believed "that was [appellant's] personality." Officer Caudill, who was also present, described appellant as calm, given the circumstances, and he interpreted appellant's demeanor as somewhat arrogant. Detective Rodriguez observed that appellant's demeanor vacillated between one of cooperation and that of being upset or mad. He also described appellant as receptive to questioning. According to Detective Sanchez, appellant showed no signs of being intoxicated or under the influence of any substances. Appellant's eyes were not bloodshot, and his speech was not slurred.

After appellant received local anesthesia and stitches for his injuries, Officers Wroblewski and Caudill transported him to the homicide division where he was placed in a small interview room

without handcuffs. Appellant was given a Dr. Pepper and was left alone in the room for approximately thirteen minutes. About five minutes after the officers left, appellant put on his shoes. A minute later, he moved his chair and lay down on the floor. About four minutes later, he got up, walked around, and turned the light off. In the next couple of minutes, he turned the lights on and off again several times.

At about 11:27 p.m., appellant turned the light on, raised his arms in the air, and said, among other things, "I thought we were having a [sic] interrogation. Seems like the silent treatment to me." Within a minute, Detectives Sanchez and Rodriguez joined appellant in the interview room. Appellant asked the detectives if they were going to play good cop/bad cop. Detective Sanchez replied, "I don't play that game." Appellant then asked if the detectives were going to question him consecutively, and Detective Sanchez responded, "No." Appellant then asked Detective Sanchez if he was the "lead detective." Detective Sanchez replied, "No," and appellant then asked, "So why am I talking to you?" Detective Sanchez then responded, "I am the lead detective." Appellant replied, "You just said no you weren't though." Detective Sanchez responded, "I am, okay. What – what I'm not doing is playing games, okay?"

Soon after this discussion, appellant asked to smoke a cigarette. Detective Sanchez responded that no smoking was permitted in the interview room. Appellant said, "Can you take me somewhere where I could smoke and talk because I – I'll – I'll talk better. If not, I might bullshit you all night – so that's the chance you willing to take, because really –." Detective Sanchez then stated, "Well, that's a chance – that's a chance I'm willing to take, okay?" Appellant replied, "Go ahead, go ahead."

Appellant and the detective then engaged in a colloquy on whether the Article 38.22 warnings

needed to be read again:

DET. SANCHEZ:      So let me just start.

APPELLANT:       I know my rights.

DET. SANCHEZ:      Let me just start.

APPELLANT:       I'm past that, you don't have to read them.

DET. SANCHEZ:      Well, I'm gonna read them, okay?

APPELLANT:       But you don't have to read them.

DET. SANCHEZ:      Well, let me just read them to you.

APPELLANT:       Go ahead.

Detective Sanchez proceeded to again read the Article 38.22 warnings. After each warning, he asked appellant if he understood his rights, and appellant nodded or answered affirmatively. When Detective Sanchez reached the point about an attorney being appointed if appellant could not afford one, appellant gave an inaudible response, and Detective Sanchez asked if appellant wanted that warning read again. Appellant responded, "Yeah," but when the detective began reading, appellant asked, "Hold on, could you start over?" Detective Sanchez then proceeded to re-read the article 38.22 warnings from the beginning. When Detective Sanchez again reached the language "if you are unable to employ a lawyer, you have the right to –," appellant interjected, "The state will appoint you an attorney for you." Detective Sanchez then read the attorney-appointment warning and the warning regarding the right to terminate the interview at any time. Again, after each warning, Detective Sanchez asked appellant if he understood his rights, and appellant indicated that he did. After the article 38.22 colloquy was finished, Detective Sanchez again asked appellant if he understood his rights, and appellant nodded.

When the article 38.22 warnings colloquy was finished, appellant asked if he could ask the detective questions. When Detective Sanchez indicated that he could, appellant said, "Cool, let's start." Detective Sanchez responded, "[B]ut first . . . I'm not gonna talk to you unless you tell me that you're willing to waive your rights and talk to me." Appellant replied, "Oh, I'll waive my rights." Detective Sanchez then asked appellant to sign the warnings card, which included a written waiver, but appellant was reluctant to do so until he was allowed to smoke a cigarette. The detectives responded that appellant would have to smoke in the garage, and he would have his hands cuffed behind his back. Eventually, Detective Sanchez asked, "Do you want to sign this card or not? Just say yes or no." Appellant replied, "Yeah, but you might not get what you want unless I get what I want. But I'll sign, that's a start right there," and he signed the card.

After answering a number of questions, appellant asked, "Why do you need all of these questions, because you have [sic] already have a solid case?" Detective Sanchez then suggested that he may not have a solid case:

DET. SANCHEZ: Do I have a solid case?

APPELLANT: Do you?

DET. SANCHEZ: I don't know, you tell me.

APPELLANT: I'm asking you.

DET. SANCHEZ: I don't know that I do.

Appellant then responded, "If you don't know that you do, then I'm not gonna give you one." Detective Sanchez then asked, "You're not gonna give me one?" and appellant responded, "Why should I?" Then Detective Sanchez asked, "Okay, so you don't want to talk about it?" Appellant responded, "I will talk about it but I have not smoken any cigarettes yet." Detective Sanchez replied

that he was not going to let appellant smoke a cigarette.

After a few more questions that failed to elicit information from appellant, Detective Rodriguez told appellant that they needed his side of the story. Appellant replied, "Y'all don't need my side because I'm the one fixing to burn up for this shit and if y'all are some damned detectives – hold on, let me finish. If y'all are some detectives and y'all can detect and investigate and probe and then examine, asking me these questions is useless." Detective Rodriguez then said that they wanted to understand "why." Appellant responded, "You tell me what happened and I might could tell you why it happened if you tell me what happened." Detective Rodriguez then asked appellant if he broke into the apartment, and appellant admitted that he "broke in." Up to this point, appellant exhibited a calm demeanor.

After admitting that he "broke in," Aappellant then told the detectives:

> Ask one question, want the truth. Now as far as I'm concerned, if this goes any more further, y'all ain't gonna like what y'all hear and I'm not gonna like what I hear, because, first of all, I should have an attorney, that's first of all, and I'm pretty sure y'all have already looked at my track record to see how many assaults I have on top of this other one that y'all are talking about, right. Aggravated assault with attempted murder, so do you think that I don't know I'm going – that I'm not gonna get anything less than twenty?

Detective Sanchez began to respond, "Well –," but appellant cut him off, becoming agitated and raising his voice, as he continued: "Do you – do you think that I don't know this shit? And so if you think – if you – now I'm telling you that I know this shit, why the fuck should I give a fuck about helping y'all out?" Detective Sanchez responded, "Okay," and appellant continued: "And I can't even smoke a fucking cigarette. You can take me to my cot and I can lay my nigger ass down and I'll go do my fucking time and I'll play games in the god-damn system like they play with me."

Detective Sanchez then asked appellant if he could call him by his given name, but appellant,

beginning to calm down, indicated that he preferred to be called by his initials, S.P. Detective Sanchez then informed appellant that R.M. had been raped. Appellant responded, "Well you gotta prove that because I didn't rape her." Detective Sanchez then responded that R.M. was raped and that Regina Lara had been killed. Detective Sanchez then asked if appellant had "anything to do with that?" At this point, appellant returned to a state of complete calm and responded, "Umm, what do you think?" Detective Sanchez replied, "I'm asking you, I wasn't there." Appellant responded, "So basically, y'all haven't got any –," and Detective Sanchez interjected, "I was at home having dinner, and I got a call to come over here and talk to you about it, and that's why I'm here. I wasn't there." Appellant responded, "I killed her."

After confirming that appellant was admitting to killing Regina, Detective Sanchez asked, "Why?" Appellant then launched into a long invective about his reasons, with only slight responses or interruptions by the detectives. Eventually, the interview returned to question-and-answer format. Shortly into that portion of the questioning, however, appellant said, "Didn't you just hear me say I killed her? What else do you want? You need the whole nine yards? Can I get a cigarette now, Homie? Can I get a cigarette now, Homie, and we could finish this shit." Detective Rodriguez responded, "Okay." Appellant said, "Please?"

After the appellant and the detectives interrupted each other several times, appellant asked, "We can't take a break?" Detective Sanchez replied, "No." Appellant responded, "Well, then, I'm – I'm through, man." Detective Sanchez said, "Okay." Appellant stated, "I'm through man, if I can't get no cigarette, that's all you need to know." As appellant was terminating the interview, he started to stand. Detective Sanchez told appellant to sit, and appellant complied, but as Detective Sanchez began to leave the room, appellant chose to stand again. Detective Sanchez told appellant

to sit, but appellant refused, saying he would not hurt anyone. Appellant was told that he could stand if he wanted, and the detectives exited the room.

While appellant was alone in the room, he made a number of statements. He demanded a cigarette numerous times and threatened to withhold any further information until he got one. Nevertheless, appellant volunteered several times that he killed the victim—saying once, "I killed that bitch." Appellant spewed profanities, threatened to kill one of the officers or fight the officers, said that he hoped that he received lethal injection because he hated this planet, and said, "When I get to jail, it's possible I will kill again, too."

Receiving no response to these statements, appellant became quiet, then started shouting obscenities while occasionally kicking the door, and then started kicking the door continuously. Soon, appellant was told to calm down. Detectives entered the room, carrying tasers, and told appellant to turn around and face the wall. Appellant complied. Appellant asked, "Is the interrogation over?" Detective Sanchez replied, "The interrogation is over. Okay, quit kicking my door, okay?" Appellant responded, "Man, all I wanted was to talk, man. I was gonna give you the whole story. You think I'm lying? You ain't got everything." Detective Sanchez replied, "You said you were finished. You're finished, okay?" Appellant continued talking about how he wanted a cigarette, and just because he was guilty did not mean he did not deserve mercy, compassion, and the truth. Eventually, Detective Sanchez promised to give appellant a cigarette. However, Detective Sanchez's sergeant did not allow appellant to smoke one at the station because of his behavior.

Two days later, on August 24, 2006, the Travis County Correctional Complex psychiatrist, Dr. John Ford, had a routine visit with appellant. Appellant told Dr. Ford that he had no history of mental illness. During his evaluation, Dr. Ford saw no signs of mental illness and did not believe

that appellant was in a drug-induced psychotic state when he was arrested. Three days after Dr. Ford's visit, appellant was found lying in a fetal position with a sheet tied around his neck. It was determined that this was not a serious suicide attempt; appellant admitted that he acted stupidly. Dr. Ford again evaluated appellant on August 29, 2006, and noted that appellant was rational and reasonable.

In September, several weeks after his arrest, appellant reported "hearing voices." Dr. Ford prescribed anti-psychotic medications for appellant, and his mental state improved. Dr. Ford described the medications as a fairly substantial dosage that would not be tolerated by a person who was not mentally ill. While Dr. Ford agreed with defense counsel that a drug-induced psychosis could possibly persist for a month, he never made a diagnosis that appellant was suffering a drug-induced psychosis.

At the trial court's request, Dr. Maureen Burrows evaluated appellant for competency on July 8, 2007. Dr. Burrows found that appellant suffered from depression, but determined that he was competent to stand trial. She additionally found appellant to be coherent and not psychotic. While Dr. Burrows had reviewed some records that indicated appellant had suffered a drug-induced psychosis when he arrived at the jail, his hospital records did not support a psychotic diagnosis. Appellant was lucid during his evaluation and remembered details of his offense, which would be atypical for someone who was psychotic.

At the trial court's request, Dr. Burrows also reviewed the DVD of the statement appellant made at the police station. She saw no signs of psychosis in appellant's behavior on the video. Appellant did not have any breaks with reality, and he displayed patterns of someone with full command of his faculties and with an intact memory. Appellant communicated logically with the

officers.  He also showed evidence of logical thought processes and attempts at manipulation, which are both inconsistent with psychosis.  Dr. Burrows reported that appellant's complaints regarding psychotic symptoms were inconsistent and were indicative of malingering.  Dr. Ford, however, stated that he did not believe that appellant was malingering in terms of mental illness.

## 2. *Voluntariness*

In point of error seven, appellant alleges that his confession "was not voluntar[ily] and knowingly entered into."  He cites Supreme Court due process cases that address whether, under the totality of the circumstances, a suspect's will was overborne during interrogation.[34]  Appellant observes in passing that the trial court had ruled that appellant's confession was admissible under Article 38.22.

Appellant argues that a number of "factors militate against a finding of voluntariness."  He points out that the police initiated the interrogation and interviewed him in a police interrogation room with a hidden camera.  He contends that they employed "questionable interrogation tactics" such as "leading questions, repeated verbal attacks, creating a heightened sense of fear, disbelief or repeated questioning on answers that do not match the crime scene."  And he claims that he "had just been through multiple days without sleep, prolonged drug use which affected his abilities to understand and knowingly waive his rights, as well as a physical confrontation with the police, which ended with him being taken to the hospital, where he received stitches and local anaesthetics."  He also claims that he was either under the influence of drugs or suffering from the after-effects of "coming off" drugs, that his "mental state at the time he was given and waived his *Miranda* rights

---

[34] *See e.g. Haynes v. Washington*, 373 U.S. 503 (1963); *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973).

was unquestionably altered," and that, soon after his incarceration, the treating physician in the jail

began to administer three very potent anti-psychotic drugs that would cause significant side effects

in a normal person but seemed to improve appellant's condition. Appellant also discussed medical

testimony suggesting that he may have been psychotic at one time or prone to psychosis. Appellant

concludes:

> Under the totality of the circumstances, taking into consideration the factual inquiry, both the conduct of law enforcement and the suspect's capacity to resist that pressure, it is obvious that appellant was unable to withstand the onslaught of his interrogators, in conjunction with this interrogation technique caused a subordination of his will to resist. The statement appellant gave was not of his own rational intellect and free will. Appellant requests that this Court find that his confession was not voluntary and find that its admission violated his Constitutional rights, and reverse and remand this case for a new trial.

A statement is obtained in violation of constitutional due process only if the statement is

causally related to coercive government misconduct.[35] Coercive government misconduct renders a

confession involuntary if the defendant's "will has been overborne and his capacity for self-

determination critically impaired."[36] Whether this has occurred is determined by assessing the

"totality of all the surrounding circumstances," including "the characteristics of the accused and the

details of the interrogation."[37] Under Article 38.22, a statement must be "made under voluntary

conditions,"[38] and a suspect must "knowingly, intelligently, and voluntarily waive[] any rights set

---

[35] *Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986); *Oursbourn v. State*, 259 S.W.3d 159, 169-71 (Tex. Crim. App. 2008).

[36] *Schneckloth*, 412 U.S. at 225-26.

[37] *Id.*

[38] Art. 38.22, §6.

out in the [Article 38.22] warning."[39]  The statutory inquiry does not necessarily turn on police overreaching: "A confession given under the duress of hallucinations, illness, medications, or even a private threat" could render a statement involuntary under Article 38.22.[40]

We disagree with appellant's claim that the police engaged in questionable practices.  We perceive no police misconduct in this case.  Appellant was given Article 38.22 warnings on multiple occasions.  Detective Sanchez was especially diligent in reading the warnings in their entirety, in making sure that appellant understood them, and in obtaining an express waiver by appellant of his rights.[41]  Detective Sanchez made it clear that whether appellant participated in an interrogation was entirely his choice.  Detective Sanchez even suggested that he might not have a solid case.[42]  The detectives would not allow appellant to smoke in the interview room, but they never suggested that being allowed to smoke depended upon appellant's participation in the interrogation.  Because appellant was under arrest, the officers were not required to let him smoke at all, and at the beginning of the interview, the officers did not foreclose the possibility of appellant smoking in the police garage, albeit in handcuffs.

We also disagree with appellant's contention that his waiver of rights and his statement were not products of his own rational intellect and free will.  The evidence at trial shows that appellant

---

[39]  *Id.*, §3(a)(2); *see also id.*, §2(b).

[40]  *Oursbourn*, 259 S.W.3d at 172.

[41]  *See Carter v. State*, 309 S.W.3d 31, 34 n.9 (Tex. Crim. App. 2010) (suggesting that, though express waiver is not required,  "interrogating officers should request an express waiver of *Miranda* rights to avoid later litigation and the possible exclusion of incriminating statements").

[42]  *Cf. Frazier v. Cupp*, 394 U.S. 731, 737-39 (1969) (confession not rendered involuntary when police officer falsely told suspect that co-conspirator had confessed, and police officer said, "You can't be in any more trouble than you are in now.").

was willing—even eager—to talk to the police. Appellant repeatedly told the detectives that he knew his rights, and, after being read the article 38.22 warnings, he repeatedly affirmed that he understood them. Although appellant indicated some trouble when Detective Sanchez read the warning about appointment of counsel, appellant later paraphrased that warning intelligently. Appellant was calm through most of the interview, and he exhibited a rational understanding of the questioning. He understood, for example, that if the police did not have a solid case, his participation in the interview might give them one. Although expert testimony indicated that appellant may suffer from mental illness, the testimony also indicated that appellant was not suffering from a psychosis at the time of the interviews.

Appellant did ask for a cigarette several times, but he did not appear to be suffering any significant withdrawal symptoms—from nicotine, cocaine, or any other drug. In *United States v. Kelley*, the Ninth Circuit held a statement to be voluntary even though the suspect was suffering from heroin withdrawal.[43] Two thirds of the way through the interview, Kelley "began experiencing chills, shaking, and trembling."[44] Despite those symptoms, Kelley "remained coherent and responsive" and the court concluded that the "effects of withdrawal did not overcome Kelley's ability to think rationally."[45] Whatever cravings appellant may have been having for cigarettes, they were not nearly as severe as the withdrawal symptoms exhibited by the suspect in *Kelley*. Point of error seven is overruled.

### 3. *Request for Counsel*

---

[43] 953 F.2d 562, 565 (9th Cir.1992).

[44] *Id.*

[45] *Id.*

In point of error eight, appellant complains that his confession was inadmissible under *Miranda* because the detectives failed to honor his request for an attorney. He claims that his statement, "I should have an attorney," accompanied by his question about why he should help out the detectives, constituted an unambiguous invocation of his right to counsel, and that the detectives failed to honor that invocation when they continued the interview. According to Detective Sanchez, "It was our interpretation at the time that he hadn't actually invoked. He didn't say he wanted an attorney. He was making a suggestion, so we didn't interpret that as him invoking his right to an attorney." The trial court found the "I should have an attorney" statement to be ambiguous: "Based upon the totality of the circumstances, the court finds that – the statement to be in context from the entire conversation with [appellant], that the statement was ambiguous." The trial court also found that, even if the statement was not ambiguous, "[appellant] immediately reinitiated the interview with the officers and continued to ask them questions."

When a suspect asks for a lawyer, interrogation must cease until counsel has been provided or the suspect initiates further communication with the police.[46] To trigger law enforcement's duty to terminate the interrogation, a suspect's request for counsel must be clear, and the police are not required to attempt to clarify ambiguous remarks.[47] Whether a statement referring to a lawyer constitutes a clear request for counsel depends on the statement itself and the totality of the circumstances surrounding the statement.[48] The test is objective: whether the suspect "articulate[d]

---

[46] *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981); *State v. Gobert*, 275 S.W.3d 888, 892 (Tex. Crim. App. 2009).

[47] *Davis v. United States*, 512 U.S. 452, 461-62 (1994).

[48] *Gobert*, 275 S.W.3d at 892.

his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."[49]  If the accused's invocation of the right to counsel is clear, his responses to further questioning may not be used to cast doubt retrospectively on the clarity of his initial request.[50]

In *Davis v. United States*, the Supreme Court held that the statement, "Maybe I should talk to a lawyer," did not constitute a clear request for counsel.[51]  The Supreme Court has not addressed whether its analysis would change if the word "maybe" was absent from the statement.  But, relying upon *Davis*, a number of other jurisdictions have found declarative statements without the "maybe" modifier to be ambiguous: "[B]ut, excuse me, if I am right, I can have a lawyer present through all this, right?,"[52] "I think I need a lawyer,"[53] "I think I better talk to a lawyer first,"[54] "[T]he best thing I can do is, for myself, is to shut the hell up and not talk about this without first talking to a

---

[49]  *Id.* at 892-93.

[50]  *Smith v. Illinois*, 469 U.S. 91, 100 (1984); *Smith v. State*, 779 S.W.2d 417, 425 (Tex. Crim. App. 1989); *see also Gobert*, 275 S.W.3d at 893 (courts should not attempt "to determine in retrospect whether the suspect really *meant* it when he unequivocally invoked his right to counsel") (emphasis in original).

[51]  512 U.S. at 455, 462.

[52]  *United States v. Younger*, 398 F.3d 1179, 1187-88 (9th Cir. 2005).

[53]  *Burket v. Angelone*, 208 F.3d 172, 197-98 (4th Cir. 2000).  *See also In re H.V.*, 252 S.W.3d 319 (Tex. 2008) (citing *Burket*); *Clark v. Murphy*, 331 F.3d 1062, 1071 (9th Cir. 2003) (contrasting two pre-*Davis* cases that held similar language to be an unequivocal request for counsel with *Burket* and another post-*Davis* case finding such language to be ambiguous).

[54]  *State v. Eastlack*, 180 Ariz. 243, 250-51, 883 P.2d 999, 1007 (1994).

lawyer,"[55] "I probably should have an attorney,"[56] "I feel as though I should have an attorney . . . because how ugly this looks on me,"[57] "I'll be honest with you, I'm scared to say anything without talking to a lawyer,"[58] and "I think I should see an attorney."[59]

Other jurisdictions appear to have come to a contrary conclusion, finding an unambiguous request for counsel in statements such as "I think I need a lawyer present,"[60] "Well, I think I need a lawyer,"[61] "I think it would be in my best interest to talk to an attorney,"[62] "I think I'd rather talk to a lawyer,"[63] and "I think I should call my lawyer"[64]—although those courts also observed that law enforcement agents who heard the statements understood each to be a request for counsel.[65] A few courts have found an unambiguous request for counsel in statements that included the clause, "I

---

[55] *Sykes v. State*, 2009 Ark. 522, at 15, 2009 Ark. LEXIS 673, at 22 (October 29, 2009).

[56] *State v. Goodwin*, 278 Neb. 945, 959, 774 N.W.2d 733, 744-45 (2009); *State v. Hilding*, 278 Neb. 115, 127-28, 769 N.W.2d 326, 337 (2009).

[57] *Stemple v. State*, 2000 OK CR 4, 34-36, 994 P.2d 61, 69-70 (2000).

[58] *Midkiff v. Commonwealth*, 250 Va. 262, 265-67, 462 S.E.2d 112, 114-15 (1995).

[59] *State v. Jennings*, 252 Wis. 2d 228, 233-34, 244-45, 647 N.W.2d 142, 144-45, 150 (2002)(conclusion in earlier Wisconsin Supreme Court case that this language constituted an unequivocal request overturned by United States Supreme Court's decision in *Davis*).

[60] *State v. Jackson*, 348 N.C. 52, 56-57, 497 S.E.2d 409, 411-12 (1998).

[61] *State v. Kennedy*, 333 S.C. 426, 429-30, 510 S.E.2d 714, 715-16 (1998).

[62] *Alford v. State*, 699 N.E.2d 247, 251 (Ind. 1998).

[63] *State v. Munson*, 594 N.W.2d 128, 139-40 (Minn. 1999).

[64] *Cannady v. Dugger*, 931 F.2d 752, 755 (11th Cir. 1991). *See also United States v. Shabaz*, 579 F.3d 815 (7th Cir. 2009) (discussing *Cannady* with approval).

[65] *Jackson*, 348 N.C. at 57, 497 S.E.2d at 412; *Kennedy*, 333 S.C. at 430, 510 S.E.2d at 715; *Alford*, 699 N.E.2d at 251; *Munson*, 594 N.W.2d at 139; *Cannady*, 931 F.2d at 755.

should talk to a lawyer."[66]

In *Smith v. Endell*, the suspect said, "Can I talk to a lawyer? At this point, I think maybe you're looking at me as a suspect, and I should talk to a lawyer. Are you looking at me as a suspect?"[67] The Ninth Circuit held that the suspect had made a clear, though conditional, request for counsel.[68] Because the condition had been satisfied (Smith was considered a suspect), the suspect's statement was an unambiguous invocation of his right to counsel.[69]

In *State v. Romero*, the suspect said, "Yea. Cause I, ya know, I'm not gunna lie man, ya know, I mean I should wait, and I should talk to a lawyer and this and that and ya know because I do want to go to trial on this."[70] The trial judge in that case found the statement to be an unambiguous request for an attorney and granted the defendant's motion to suppress.[71] Upholding the suppression order in an interlocutory appeal, the Supreme Court of Colorado found that the evidence supported the trial court's finding that the suspect had "reasonably conveyed his desire for the assistance of counsel."[72] Giving deference to the trial court's assessment of the factual issues, the Supreme Court of Colorado observed that the trial court "did not accept [the police officer's] explanation that the suspect was in effect saying, 'I know I should talk to a lawyer, but I'm going to

---

[66]  *Smith v. Endell*, 860 F.2d 1528, 1529, 1531 (9th Cir. 1988); *Shabaz*, 579 F.3d at 819 (discussing *Smith*); *State v. Romero*, 953 P.2d 550 (Colo. 1998).

[67]  860 F.2d at 1529.

[68]  *Id.* at 1531.

[69]  *Id.*

[70]  953 P.2d at 552.

[71]  *Id.* at 553.

[72]  *Id.* at 557.

tell you what happened.'"[73] In a dissent, Justice Mullarkey argued that "it is entirely unrealistic to ask a police officer to distinguish the statement in *Davis*—'Maybe I should talk to a lawyer'—which the Supreme Court held was not a request for counsel, and the statement in this case—'I should talk to a lawyer.'"[74] A later Colorado Supreme Court case has explained that *Romero* stands for the proposition that "a reasonable officer would have understood the statement, 'I should talk to a lawyer . . . because I do want to go to trial on this' to be a clear request for counsel given the surrounding circumstances."[75]

Appellant's statement "I should have an attorney" was not in the form of a request, nor did appellant expressly say that he wanted a lawyer. Even in cases such as *Smith* and *Romero*, where a "should" statement was determined to be an unambiguous request, the courts have suggested that the surrounding circumstances were highly relevant considerations. Assuming *arguendo* that a "should" statement could constitute an unambiguous request under the right circumstances, the circumstances present here convince us that a unambiguous request for counsel was not made.

Use of the word "should" could simply mean that appellant believed having an attorney was in his best interests, but he could choose to disregard his best interests and talk to the police anyway. This interpretation of events is bolstered by appellant's immediately preceding statement, "[I]f this goes any . . . further," the police are not going to like what they hear.

That appellant's statement, "I should have an attorney," was not a request for an attorney is also bolstered by the fact that he subsequently asked the detectives why he should help them out.

---

[73] *Id.*

[74] *Id.* at 560 (Mullarkey, J., dissenting).

[75] *People v. Arroya*, 988 P.2d 1124, 1132 (Colo. 1999).

In his brief on direct appeal, appellant characterizes his question to the detectives as "rhetorical." But it may have been a real question. Whether the question was rhetorical or real is ambiguous. If the question was real, then appellant was signaling that the interview should continue, at least for the moment, by asking the officers to give him a good reason to cooperate. The officers did so by explaining that R.M. had been raped, and the interview continued without appellant saying anything that could be construed as an objection to doing so. And although appellant's question was asked after he said, "I should have a lawyer," that question came very soon afterwards, before the detectives asked any other questions. We hold that appellant's statement was not, under the circumstances presented here, a clear request for counsel. Point of error eight is overruled.

### E. Unanimous Verdict

In point of error ten, appellant alleges that the trial court erred in its instructions to the jurors regarding a finding of a unanimous verdict on the underlying offense of burglary of a habitation. The trial court instructed jurors, over objection, that they "need not be unanimous as to the way that the burglary of a habitation was committed so long as each of you individually believes beyond a reasonable doubt that the defendant committed the intentional murder of Regina Lara in the course of committing 'Burglary of a Habitation.'" The jury charge included instructions regarding all of the statutory means of committing burglary, along with the definition of the offense of sexual assault of a child, and the instruction that sexual assault of a child is a felony. Appellant points out that the underlying offense of burglary, as instructed, could involve: (1) burglary based upon theft of property from Regina, or (2) burglary based upon the sexual assault of R.M.[76] Appellant argues, "Because there are two victims of burglary of a habitation and two distinct and separate crimes committed

---

[76] *See* TEX. PENAL CODE § 30.02(a) (elements of burglary).

against them, under the *Blockburger*[77] test there are two different offense[s]."

Although the double jeopardy and jury unanimity strands of our jurisprudence are closely intertwined, the *Blockburger* "same elements" test is not the sole test to be used in either context.[78] In the jury unanimity context, whether different legal theories of committing a crime constitute different offenses or merely constitute alternate methods of committing the same offense usually depends upon the focus or gravamen of the offense or offenses in question.[79] With respect to homicide offenses—which focus on the death of an individual—"we have held that different legal theories involving the same victim are simply alternate methods of committing the same offense."[80] For capital murder prosecutions in particular, we have held that a jury charge may disjunctively allege different capital murder theories with respect to the same victim.[81] The jury charge may disjunctively allege "all alternate theories of capital murder contained within §19.03, whether they are found in the same or different subsections, so long as the same victim is alleged for the predicate murder."[82]

Appellant contends that there were two underlying burglaries because there were two victims (Regina and R.M.) and two underlying offenses connected with the unlawful entry (theft and sexual assault). Even if that were so, there would still be only one capital murder, based upon the murder

---

[77] *See Blockburger v. United States*, 284 U.S. 299 (1932).

[78] *Huffman v. State*, 267 S.W.3d 902, 905 (Tex. Crim. App. 2008).

[79] *Id.* at 907.

[80] *Id.* at 905.

[81] *Id.* (citing *Kitchens v. State*, 823 S.W.2d 256, 257 (Tex. Crim. App. 1991)).

[82] *Gamboa v. State*, 296 S.W.3d 574, 584 (Tex. Crim. App. 2009).

of Regina. Nothing prohibits a single capital murder from containing alternate underlying offenses that are the same statutory offense but with different victims or different underlying methods of commission, so long as the same victim is alleged with respect to the predicate murder. In any event, appellant's contention regarding burglary is incorrect. The gravamen of a burglary is the entry without the effective consent of the owner, so the existence of multiple victims, or multiple underlying offenses connected with the entry, does not convert a single unlawful entry into multiple burglaries.[83] Point of error ten is overruled.[84]

### III. PUNISHMENT

### A. Jury Selection[85]

### 1. *Denial of Defense Challenge for Cause*

In point of error two, appellant complains about the trial court's refusal to grant a challenge for cause against prospective juror Dominguez. Appellant alleges that Dominguez stated that he would automatically find an individual to be a future danger after finding him guilty of capital murder. Appellant also argues that Dominguez had a bias because he would "lean towards" finding that someone was a future danger based upon a guilty finding.

Before harm can be shown on the record with respect to a trial court's denial of a challenge

---

[83] *Ex parte Cavazos*, 203 S.W.3d 333, 335-37 (Tex. Crim. App. 2006).

[84] Ironically, out of an abundance of caution, the trial court did choose to submit as separate verdicts capital murder with the underlying offense of burglary and capital murder with the underlying offense of robbery. As we have explained above, it was not required to do so. *See Huffman*, 267 S.W.3d at 905 (citing *Kitchens*).

[85] In capital cases, jury selection claims that revolve around punishment issues are errors relating to punishment only. *Ransom v. State*, 920 S.W.2d 288, 297-98 (Tex. Crim. App. 1996) (opinion on reh'g).

for cause, a defendant must: (1) use a peremptory strike on the complained-of venire member; (2) exhaust his peremptory strikes; and (3) request an additional peremptory strike to use upon a specifically identified objectionable venire member who, because the extra strike is denied, actually sits on the jury.[86]

In a death penalty case with only one defendant, the defendant is entitled to fifteen peremptory challenges.[87] The record shows that appellant used only nine of his fifteen peremptory strikes.[88] Appellant did not suffer harm with regard to this complaint. Point of error two is overruled.

## 2. *Witherspoon Claim*

In point of error three, appellant claims that the trial court erred in granting the State's challenge for cause against prospective juror Paul. Appellant argues that Paul's answers to the parties' questions showed that he would have been able to answer the special issues, would have been able to take the oath, and would have been able to follow the law as given by the trial court. Referring to *Witherspoon v. Illinois*[89] and *Wainwright v. Witt*,[90] appellant claims that he has "the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause," and he claims that the trial court's action here resulted

---

[86] *Busby v. State*, 253 S.W.3d 661, 670 (Tex. Crim. App. 2008).

[87] T EX. CODE CRIM. PROC. art. 35.15(a).

[88] Two alternate jurors were impaneled in this case. Consequently, appellant was entitled to one additional peremptory challenge exclusively for the purpose of striking a potential alternate juror, *id.*, art. 35.15(d), and appellant exercised that additional peremptory challenge.

[89] 391 US 510 (1968).

[90] 469 U.S. 412 (1985).

in reversible error under *Gray v. Mississippi*.[91]

Under *Witherspoon* and its progeny, a trial court may grant a State's challenge for cause on the basis of a prospective juror's conscientious scruples about the death penalty if the prospective juror's views "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."[92] We review a trial court's ruling on such a matter with "considerable deference" because "the trial court is in the best position to evaluate the veniremember's demeanor and responses."[93] When a prospective juror's answers are "vacillating, unclear, or contradictory," we accord particular deference to the trial court's decision.[94] We will reverse a trial court's ruling only if the record shows a clear abuse of discretion.[95]

During examination by the State, Paul explained that he was responsible for six restaurants and that sitting on the jury "would be a huge problem." He did not believe that he could give the case the attention needed.

When the State also examined Paul regarding his questionnaire answer that he "dislike[s] reasonable doubt and think[s] it gives an out for criminals," Paul explained:

> I think to prove something beyond a reasonable doubt, unless I was physically there watching it or there was a camera there, you know, to catch something that presented evidence, I don't see how you can put someone to death or, you know, say life imprisonment, when you hear all the time of cases that are overturned for, you know, DNA or whatever.

---

[91] 481 U.S. 648 (1987).

[92] *Witt*, 469 U.S. at 433; *Smith v. State*, 297 S.W.3d 260, 268 (Tex. Crim. App. 2009).

[93] *Smith*, 297 S.W.3d at 268.

[94] *Id.*

[95] *Id.*

Paul added that he thought "it would be very hard to put someone to death based on something nobody really knows except the people involved in what occurred." When asked whether he felt that it would be impossible to prove beyond a reasonable doubt that someone had committed capital murder without having witnessed it, Paul expounded:

> I'm just saying like I just don't really see how the system works perfectly enough to ever say somebody should be condemned to death or life imprisonment without a chance of parole based on – I hope I never have to be sitting in the defendant's chair. I don't trust the people in society to make those kind of calls.

The State asked Paul whether he believed it would be easier for the State to prove something like theft by check rather than capital murder. Paul responded that he didn't know if he'd call it easier, but that "the stakes are certainly not the same as capital murder."

Further, when asked by the State whether he still agreed with his questionnaire response that he was opposed to capital punishment under any circumstances, Paul responded, "Yes." He stated that, "I don't like either of the two choices, once again, that the State is presenting. You know, to me life imprisonment without parole is basically the equivalent as (sic) the death penalty for someone." When asked by the State whether, in this particular case, he would "have to be choosing between the law and [his] personal beliefs," Paul responded:

> Absolutely. I don't see how anybody could look at it any other way. I mean, the State is going to be asking me to, you know, basically admonish [sic] somebody and something that I don't – I mean, I can't see that – I'll be honest with you. Down the line I'm going to look out for my own personal well-being based on this case. I mean, if I'm worried that it's going to bother me for the rest of my life that I put somebody to death based on a decision that I made and I don't believe beforehand that it should be done, then, I mean, yeah, I mean, I don't want to – I'm just saying. I'm being honest. I don't want to serve on a jury where I would be asked to compromise my individual beliefs, and I understand the point of the State to get to the bottom of what happened, but that is just not something that I would ever feel comfortable doing.

The State followed up by asking Paul if he believed that his views on the death penalty and on life without parole would prevent him from taking the oath to render a verdict according to the law in the case. Paul responded, "I do not think that I would be able to render that verdict." The State then asked, "And nothing that the Judge is going to say or we're going to say or the defense is going to say is going to change your feeling?" Paul responded affirmatively.

Defense counsel asked Paul if he would just "walk out" due to his views. Paul replied, "No, no, I wouldn't. I'm not going to mock the legal system. I mean, I'm a citizen." "So," defense counsel commented, "you would take the oath." Paul responded, "Yeah, and I would take the oath. I'm saying that I'm somebody who would be very interested in being part of a jury in many cases. This is not one of them."

Later, defense counsel asked if Paul could vote guilty if he believed the defendant was guilty beyond a reasonable doubt. The following exchange occurred:

A. Not based on what the State is pushing for.

Q. Well, they are just asking at this point in time would you vote guilty.

A. Would I vote guilty?

Q. Again, are you going to just refuse to vote, or what would you do? That's what I need to know?

A. I don't know. I can't answer. I feel like if the choices that are put before me are life without parole and –

Defense counsel then asked Paul to focus "just on the guilt/innocence" phase of trial and say whether he had a problem with determining whether someone was guilty. Paul replied, "No, no, but, I mean, you are asking a question in a vacuum would I do that. Yes, I can vote guilt or innocence, but then when you say, you know – "

Defense counsel then asked Paul to just answer by "steps." He inquired whether Paul could find someone guilty if he believed it, and Paul answered, "Yes." Defense counsel then asked Paul if he could vote yes if he believed that a person is likely to be a future danger. Paul again answered, "Yes." Defense counsel then explained the mitigation special issue[96] and asked Paul if he could answer that issue honestly based upon the evidence. Paul told defense counsel, "I would always answer honestly. Okay? But I'm honestly telling you beforehand that I don't consider life imprisonment without parole or the death penalty sufficient for any case."

The trial court granted the State's challenge for cause, ruling:

> Based upon the answers that [Paul] gave when the State was questioning, the demeanor and just all of it put together, he did state that he would hold them to a higher burden of proof on a capital murder case, his demeanor, the Court finds that his personal views and beliefs would prevent him from – would substantially impair his ability to uphold his duties as a juror in this case, so it will be granted.

The trial court was in the best position to evaluate Paul's demeanor and responses in determining whether his views would substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. Based upon the totality of the voir dire testimony, the trial court did not abuse its discretion in granting the State's challenge for cause. Point of error three is overruled.

### 3. *Commitment Question*

---

[96] The mitigation special issue provides:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed.

Art. 37.071, §2(e)(1).

In point of error five, appellant complains that the trial court erred in preventing the defense from questioning prospective juror Blankenship regarding the mitigation special issue. Defense counsel asked Blankenship, "Do you believe disabilities of a defendant would be something you'd take into consideration?"[97] The State objected that the defense had asked a commitment question, and the trial court sustained the objection.[98] Appellant now contends that the question was permissible because it was open-ended and not fact-specific.

A commitment question is one that commits a prospective juror to resolve, or refrain from resolving, an issue a certain way after learning a particular fact.[99] Often a commitment question requires a "yes" or "no" answer, and one or both possible answers commits a juror to resolve an issue in a particular way.[100] Not all such questions are improper, however.[101] When the law requires a certain type of commitment from jurors, such as considering the full range of punishment, an attorney may ask prospective jurors to commit to following the law in that regard.[102]

The law does not require that a juror consider any particular piece of evidence as

---

[97] Immediately before this question, defense counsel had asked, "In your mind, you know, as you think about these issues and have contemplated them, do you believe mitigating evidence has value in determining whether a person should receive the death penalty or not?" Prospective juror Blankenship answered, "I do."

[98] Neither the State nor the defense challenged Blankenship for cause or used a peremptory strike against him, and he was seated as a juror.

[99] *Standefer v. State*, 59 S.W.3d 177, 179 (Tex. Crim. App. 2001).

[100] *Id*.

[101] *Id*. at 181.

[102] *Id*.

mitigating.[103]  Or in the wording used by the question in the present case, a juror is not required to "give a particular variety of 'mitigating evidence' any consideration."[104]  The law requires only that defendants be allowed to present relevant, mitigating evidence and that the jury be provided a vehicle to give mitigating effect to that evidence if the jury finds it to be mitigating.[105]  Whether a juror considers a particular type of evidence to be mitigating is not a proper area of inquiry.[106]

The trial court was within its discretion to find that the question appellant sought to ask was an improper commitment question.  Point of error five is overruled.

### B. Admission of Criminal Record Documents

In point of error eleven, appellant alleges that he was denied his constitutional right to confront the witnesses against him, in violation of *Crawford v. Washington*.[107]  Specifically, appellant complains that the trial court erroneously admitted the following documents during the punishment phase:  Serious Incident Report dated June 25, 1998 (State's Exhibit 224); Judgment Revoking Community Supervision in case number 991288 (State's Exhibit 225); Defendant's Plea of Guilty, Waiver, Stipulation, Judicial Confession and Admonitions of the Court in case number 9020337 (State's Exhibit 227); and Judgment of Community Supervision with documents relating to case number 991288 (State's Exhibit 228).  Appellant stipulated that he was the subject of the documents.

---

[103]  *Raby v. State*, 970 S.W.2d 1, 3 (Tex. Crim. App. 1998).

[104]  *Johnson v. State*, 773 S.W.2d 322, 330-31 (Tex. Crim. App. 1989).

[105]  *Raby*, 970 S.W.2d at 3.

[106]  *Standefer*, 59 S.W.3d at 181; *Raby*, 970 S.W.2d at 3.

[107]  541 U.S. 36 (2004).

In his brief, appellant claims that he "objected to the admission of State's exhibits 224, 225, 227, and 228." The record references that he has provided reveal no objections. Our review of the record indicates that State's Exhibit 224 was read into the record without objection by the author of the report, Christine Edwards. Our review of the record also indicates that State's Exhibits 225, 227, and 228 were admitted without objection during the testimony of appellant's probation officer, Ashley Street.

Generally, in order to preserve error, there must be a timely and specific objection to the complained-of evidence.[108] Confrontation Clause claims are subject to this preservation requirement.[109] Because appellant did not object to the admission of these documents, this issue has not been preserved for review. Point of error eleven is overruled.

## C. Death of the Victim's Cat

### 1. *Background*

While further processing the crime scene on August 23, 2006, the day following the offense, Detective Sanchez discovered the victim's dead cat wrapped in a jacket and inside a pillowcase from the victim's bed and hidden in the victim's bedroom closet. On August 24, Detective Sanchez returned to the apartment to get a closer look at the cat. He learned from the apartment manager that the maintenance crew had thrown the cat into a dumpster. The manager had the cat removed from the dumpster after being informed that the detective wished to inspect the animal further. The cat was bundled up in the same manner that it had been the day before. Detective Sanchez removed the cat from the bundle and took photos. The cat had three wounds in its back. In Detective Sanchez's

---

[108] Tex. R. App. P. 33.1(a)(1)(A).

[109] *Anderson v. State*, 301 S.W.3d 276, 280 (Tex. Crim. App. 2009).

opinion, the wounds were consistent with puncture or stab wounds and were consistent with the size and shape of the knife blade used on the victim.

The State also presented testimony that the cat was seen in the victim's apartment the morning prior to the offense, that the cat was exclusively an indoor cat, and that the cat was not seen alive again after the morning of the offense. The State additionally presented testimony that a portion of the blood evidence found inside the victim's apartment tested negative for the presence of human DNA. Sanchez later recalled, during the hearing on the admissibility of the evidence, that the cat was in the dumpster for only a few hours.

The trial court ruled, over appellant's objection, that the evidence pertaining to the cat was admissible and that the detective could give his opinion, as a layperson, regarding the nature of the wounds. The trial court gave the jury a limiting instruction prior to hearing the testimony that it could not consider the testimony of the extraneous act if it did not believe beyond a reasonable doubt that appellant committed the act. The instruction was also included in the court's charge to the jury.

### 2. *General Admissibility*

In point of error twelve, appellant alleges that the trial court erred when it admitted evidence regarding the death of the victim's cat. Appellant argues that the evidence: (1) was not reliable enough to be used at trial because of problems with the chain of custody; (2) was irrelevant because the evidence could not be tied to appellant; and (3) had a prejudicial impact greater than its probative value. Appellant concedes that these errors are non-constitutional, but argues that they affected his substantial rights.

Appellant pointed out to the jury all the instances the cat's body was not in police custody and implied that someone other than appellant was responsible for the cat's wounds and death.

Absent evidence of tampering, issues regarding the chain of custody bear on the weight, rather than on the admissibility, of evidence.[110]

Regarding relevance, we point out that statute permits a trial court at the penalty stage of a capital murder trial to admit evidence "as to any matter that the court deems relevant to sentence."[111] Relevant evidence is evidence that has a tendency to make the existence of any fact more or less probable than it would be without the evidence.[112] It is generally true that evidence of extraneous bad acts committed by the defendant is relevant and admissible at the punishment stage of a capital murder trial, so long as the State "clearly proves" that the misconduct occurred and that the defendant was the perpetrator.[113] Though circumstantial, the evidence in this case clearly proved that appellant killed the cat. The cat belonged to the victim, was an indoor-only pet, was killed during the same time period, and suffered wounds similar to those suffered by the victim.

Appellant further contends that, even if relevant, the probative value of the cat evidence was substantially outweighed by the danger of unfair prejudice. Appellant contends that "[t]he cat has no 'inherent probative value' and is only similar to the evidence regarding the murder if the scientific evidence propounded by Sanchez, who admitted he had no scientific training nor conducted any tests measurements or other scientific analysis of the injuries to the cat, is to be believed." Appellant further claims that "the State lacked a need for this testimony, since the evidence could not be tied to an act by appellant beyond a reasonable doubt."

---

[110]  *Lagrone v. State*, 942 S.W.2d 602, 617 (Tex. Crim. App. 1997).

[111]  Art. 37.071, § 2(a)(1).

[112]  TEX. R. EVID. 401.

[113]  *Young v. State*, 283 S.W.3d 854, 876 (Tex. Crim. App. 2009).

We disagree with appellant that the death of the cat had no probative value. That appellant would kill a house cat is some evidence of his violent nature. Appellant complains that he suffered prejudice because the prosecutor, in closing argument, referred to this evidence as showing appellant's "brutality and gratuitous cruelty." But the prosecutor's assessment was rational and was a legitimate reason for admitting the evidence. Rule 403 does not require exclusion of evidence simply because it creates prejudice; the prejudice must be "unfair."[114] The danger of unfair prejudice exists only when the evidence has the "potential to impress the jury in an irrational way."[115] The trial court did not abuse its discretion in admitting the evidence regarding the death of the victim's cat. Point of error twelve is overruled.

### 3. *Opinion Testimony*

In point of error thirteen, appellant alleges that the trial court erred in allowing Detective Sanchez to testify as an expert regarding the comparison of the victim's injuries to those of her cat, the rate of animal decay, and the cat's time of death—despite the fact that Sanchez had no scientific training in this area. Appellant further argues that Detective Sanchez was never offered as an expert witness for any purpose.

Detective Sanchez's testimony regarding the rate of animal decay and the cat's time of death occurred only during a hearing outside the presence of the jury. Because that testimony was not admitted into evidence before the jury, appellant cannot predicate error on that basis.

With respect to the testimony about the wounds, the trial court allowed Detective Sanchez's

---

[114] *State v. Mechler*, 153 S.W.3d 435, 440 (Tex. Crim. App. 2005).

[115] *Id.* at 440-41.

testimony as a lay witness, rather than as an expert.  Under Rule 701, a lay witness may testify to "opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."[116] "Perceptions refer to a witness's interpretation of information acquired through his or her own senses or experiences at the time of the event (*i.e.*, things the witness saw, heard, smelled, touched, felt, or tasted)."[117]  Because Rule 701 requires testimony to be based on a witness's perception, the witness must have personally observed or experienced the events about which he is testifying.[118]   As a general rule, observations that do not require significant expertise to interpret and which are not based on scientific theory can be admitted as lay opinions.[119]  The admissibility of such testimony is within the discretion of the trial court and will not be reversed absent an abuse of discretion.[120]

At trial, Sanchez did not purport to possess any specialized knowledge or to be an expert in wound determination.  He testified based upon his first-hand observation of the wounds themselves.  His observations did not require significant expertise to interpret and were not based on scientific theory.  Although the jurors could view photos of the wounds, they were not in a position to observe the cat's body first-hand.  Detective Sanchez had a superior vantage point in viewing those wounds, having observed the body of the cat, while the jurors could view only two-dimensional photos.

---

[116] T EX. R. EVID. 701; *see also Osbourn v. State*, 92 S.W. 3d 531, 535 (Tex. Crim. App. 2002); *Fairow v. State*, 943 S.W.2d 895, 898 (Tex. Crim. App. 1997).

[117] *Osbourn*, 92 S.W.3d at 535.

[118] *Id.*

[119] *Id.* at 537.

[120] *Id.*

Detective Sanchez's inferences helped to provide a clearer understanding of what took place contemporaneously to the offense, and thus, the trial court did not abuse its discretion in concluding that the evidence was admissible as a lay opinion.

Even if we accepted appellant's claim that Detective Sanchez testified as an expert, however, we would conclude that Detective Sanchez possessed sufficient qualifications to do so. Detective Sanchez had been with the Austin Police Department for seventeen years and had been a detective in the homicide unit for five years. In addition to training received at the police academy, he also had training at a "basic homicide school." Although Detective Sanchez did not possess a scientific background, his training and experience were sufficient to support a conclusion that he possessed expertise at recognizing the similarity of life-terminating injuries beyond that possessed by the average person.

Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.[121]

This rule covers more than just scientific evidence, and expertise can be acquired in numerous ways, including by training or experience. An expert must possess some additional knowledge or expertise beyond that possessed by the average person, but the gap need not necessarily be monumental:

> A trial court need not exclude expert testimony simply because the subject matter is within the comprehension of the average jury. If the witness has some special knowledge or additional insight into the field that would be helpful, then the expert can assist the trier of fact to understand the evidence or to determine a fact in issue. An expert may add precision and depth to the ability of the trier of fact to reach conclusions about subjects which lie well within common experience. Because the

---

[121] TEX. R. EVID. 702.

possible spectrum of education, skill, and training is so wide, a trial court has great discretion in determining whether a witness possesses sufficient qualifications to assist the jury as an expert on a specific topic in a particular case.[122]

"If the expert evidence is close to the jury's common understanding, the witness's qualifications are less important than when the evidence is well outside the jury's own experience."[123]  Whether two cuts look like they could have been made from the same knife does not appear to be a question so far removed from a jury's common experience as to require the possession of advanced degrees or a great deal of highly specialized training.  Detective Sanchez did have some training and experience as a homicide detective.  We have recognized in the past that a police officer with experience in a homicide division may well have expertise regarding whether a certain type of injury was caused by a deadly weapon.[124]  We conclude that the trial court would not have abused its discretion if it had found that Detective Sanchez possessed sufficient expertise to give an expert opinion, based on his experience as a police officer and a homicide detective, regarding whether the wounds suffered by the cat could have been inflicted by the same knife that killed the victim.  Point of error thirteen is overruled.

### D. Psychiatric Interview/Testimony

### 1. *Interview*

In point of error fourteen, appellant contends that the trial judge erred "in allowing the state's psychiatric experts to interview appellant."  Appellant argues that "to allow two experts to 'tag team'

---

[122]  *Rodgers v. State*, 205 S.W.3d 525, 527-28 (Tex. Crim. App. 2006) (quotation marks omitted).

[123]  *Id.*

[124]  *Tucker v. State*, 274 S.W.3d 688, 692 (Tex. Crim. App. 2008).

appellant and present evidence solely focused on his future dangerousness, through the use of novel and un-tested psychiatric methodology and behavior prediction is to extend *Lagrone* to ridiculous and unconstitutional lengths." He also argues that a State expert cannot interview appellant on future dangerousness issues if appellant's expert intends to testify only on mitigation issues unrelated to future dangerousness. Appellant also mentions a trial objection to having an interview conducted by a State's expert that is from a different field than the defense expert.

To the extent that appellant is complaining that the trial court allowed two of the State's experts to interview him, that complaint is unsupported by the record. The record shows that appellant was interviewed by only one of the State's experts, the psychiatrist Dr. David Self. While Dr. Thomas Allen, the State's psychologist, did testify during the punishment phase, he did not interview appellant. To the extent that appellant is complaining of the methodology used by the State's experts, that issue is addressed in point of error fifteen.

To the extent that appellant is complaining that the trial court erred when it allowed Dr. Self to interview appellant, that complaint is without merit. The defense expressed its intention to present the testimony of its own psychiatrist, Dr. Stone, regarding mitigation issues, based, in part, on a personal interview with appellant. The State then requested that appellant submit to an interview with its own expert. Defense counsel conceded that a State expert could conduct a psychiatric examination of appellant but expressed concern about the scope of the examination. Specifically, defense counsel stated that his expert would not offer an opinion regarding appellant's future dangerousness but would examine appellant on the issues of "diminished capacity at the time, mitigating factors that are now relevant in terms of the effects of drugs taken, remorse, and adjustment to incarceration." Appellant objected to being interviewed by a psychologist and

submitting to any sort of psychological testing, including a psychopathy checklist interview, when his expert was not going to be conducting any testing. The trial court agreed with the defense that the State's psychologist should not interview appellant and that the State's psychiatrist should not conduct a HARE psychopathy checklist, and the trial court ruled accordingly. The discussions relating to the scope of the examination by the State's expert occurred over a two-day period, with the defendant ultimately waiving his Fifth Amendment right against self-incrimination solely with regard to submitting to an examination by the State's psychiatrist.

It is unclear that appellant has preserved any error. He received relief from the trial court regarding what expert could examine him and the scope of that examination. It is not clear to us that he effectively communicated to the trial court that he still had remaining objections to the procedure.[125]

Even if error were preserved, we find his contention to be without merit. Appellant acknowledges, as he must, that the trial court could order him to submit to an interview from a State mental health expert;[126] he complains only about the scope of the examination. But the subject matter of the defense psychiatrist's interview—"diminished capacity at the time, mitigating factors that are now relevant in terms of the effects of drugs taken, remorse, and adjustment to incarceration"—are factors that could be taken into account in determining future dangerousness. Appellant's attempt to draw a hairsplitting distinction between these topics and a State expert's

---

[125] *See* TEX. R. APP. P. 33.1(a)(1)(A) (party's complaint must be made with "sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context").

[126] *See Chamberlain v. State*, 998 S.W.2d 230, 234 (Tex. Crim. App. 1999); *Lagrone*, 942 S.W.2d at 611.

ultimate opinion as to future dangerousness is untenable and conflicts with the underlying rationale for the *Lagrone* rule: "[I]f a defendant breaks his silence to speak to his own psychiatric expert and introduces that testimony which is based on such interview, he has constructively taken the stand and waived his fifth amendment right to refuse to submit to the State's psychiatric experts. The focus is the defendant's choice to break his silence."[127]  Point of error fourteen is overruled.

## 2. *Testimony*

Appellant' fifteenth point of error reads: "The trial judge erred in allowing the admission of psychiatric testimony which did not satisfy constitutional admissibility." In his supporting argument, however, appellant does not rely upon any constitutional provision or cite any cases deciding an issue on constitutional grounds.  Instead, appellant argues within his brief that the testimony of Dr. Self and Dr. Allen regarding appellant's future dangerousness failed to satisfy the criteria for admissibility under Rule 702.  Appellant argues that the State did not establish with any degree of specificity how the doctors were qualified to testify as to their opinions regarding appellant's future dangerousness and failed to carry its burden of proving the doctors' testimony reliable.

Appellant does not allege in his brief that he objected to the testimony of these expert witnesses.  Ordinarily, an objection is required to preserve error for review.[128]  An appellant is obligated to point out to this Court where the record shows that he has preserved error on his

---

[127]  *Chamberlain*, 998 S.W.2d at 234.

[128]  TEX. R. APP. P. 33.1(a)(1).

claim.[129]  In discussing the substance of his claim, appellant refers to a *Daubert*[130] hearing held by the trial court on the admissibility of the expert testimony.  In an abundance of caution, we have reviewed the transcript of this hearing to determine whether an objection was lodged.  Both the prosecutor and defense counsel questioned the expert witnesses on their qualifications and methodology.  The trial court expressly found both experts to be qualified, their methodologies to be accepted by the relevant scientific community, and their testimony to be relevant and reliable in helping a jury understand the issue of future dangerousness.  Appellant did not, during this hearing, lodge an objection to the testimony of these witnesses.  Defense counsel did not suggest to the trial court that the witnesses were unqualified or the methodologies unreliable, nor did he present any evidence to that effect.  Appellant has failed to show us that he has preserved error.

Even if we found that appellant had lodged a sufficient objection at trial, he has failed to present us with any reason to find the expert testimony to be inadmissible.  He presented no evidence at trial, nor does he present any argument on appeal, to affirmatively demonstrate the experts' lack of qualification or the unreliability of the methodologies employed.  Appellant's only argument is that the State failed in its burden to show that the experts were qualified and the methodologies reliable.  In that respect, we conclude that appellant is mistaken.

Dr. Self testified that he served as a senior psychiatrist with the forensic service at Rusk State Hospital, had a private practice specializing in criminal forensic psychiatric consulting for both the defense and the prosecution, and was a clinical assistant professor in the Department of Psychiatry

---

[129] *Russeau v. State*, 291 S.W.2d 426 (Tex. Crim. App. 2009) (citing Tex. R. App. P. 33.1(a) & 38.1(h)).

[130] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

at the University of Texas, Southwestern, at Dallas. Dr. Self received his medical degree from the University of Texas Medical Branch at Galveston and completed a three-year residency in psychiatry. He was board certified by the American Board of Psychiatry and Neurology in 1993 and had been in private practice since 1995. Dr. Self testified that he belonged to the American Psychiatric Association, the Texas Society of Psychiatric Physicians, and the American Academy of Psychiatry and the Law. He also testified that he served on the Texas Manifest Dangerousness Review Board.

Dr. Allen testified that he was a forensic psychologist with a private practice. He received his master's degree in psychology from Texas A&M University, College Station and a Ph.D. in psychology from Texas A&M University, Commerce. Dr. Allen completed a year-long pre-doctoral internship in the forensic psychiatric unit at Rusk State Hospital and a post-doctoral internship in neuropsychological testing at University Park Hospital. He was licensed to practice psychology in 1985, and he began working in the area of forensic psychology two years later. These qualifications provided the trial court with a more than adequate basis for admitting Dr. Self's and Dr. Allen's testimony under Rule 702.[131]

Dr. Self and Dr. Allen also testified regarding their separate methodologies. Dr. Self, who interviewed appellant, first described the various methods of assessing future dangerousness. He testified that his approach, which he described as "probably the best accepted approach right now,"

---

[131] *See McBride v. State*, 862 S.W.2d 600, 607-08 (Tex. Crim. App. 1993) (upholding the trial court's discretion in allowing future dangerousness testimony based on credentials similar to those in this case); *Joiner v. State*, 825 S.W.2d 701, 708 (Tex. Crim. App. 1992) (upholding the admission of future dangerousness testimony based on similar credentials).

was a combination of actuarial prediction and the anamnestic method.[132] Dr. Self explained that he looked at a list of factors that had been most strongly associated with the increased risk of future violence and evaluated to what degree those factors were present in the subject. He also examined the background of the subject and looked for additional clues as to factors that aggravate or mitigate the risk of violence. Dr. Self identified these factors as straight-forward demographic, personality feature, historical, and contextual factors. He also looked at the availability of victims, clinical issues such as major psychotic illnesses, and substance abuse. Dr. Self described this method as risk assessment and testified that he would not give a precise number, but would describe a person with the defendant's characteristics as a low, medium, or high risk for future dangerousness.

Dr. Allen, who did not interview appellant, explained that his methodology for risk assessment involved the collection of data pertaining to any history of violence and criminality. He described the tools used to collect that data and testified that he used the HCR-20 and the HARE psychopathy checklist. Dr. Allen testified that both assessment tools are widely published, have been subjected to peer review, and are relied upon regularly by other psychologists. He explained that while the HCR-20 did not require much training, the HARE checklist did; Dr. Allen testified that he had been trained in the use of the checklist. He testified that he had been using the HCR-20 for ten years and the HARE checklist for twelve. Dr. Allen further explained that the assessments do not require an actual face-to-face interview with a subject, but that clinical correlation is necessary. He, like Dr. Self, stated that he could not provide guidance on what exactly a subject would do in the future, but could classify the subject as low, medium, or high risk for continuing acts of violence.

---

[132] Dr. Self contrasted his approach with what he believed was a method that had "kind of tainted the field . . . the kind of the Dr. Death approach to things where just on someone's personal experience and judgment and hunches they make absolutive statements. I don't do that."

In determining whether evidence derived from a "soft science" such as psychology is sufficiently reliable, we examine: (1) whether the field of expertise is a legitimate one, (2) whether the subject matter of the expert's testimony is within the scope of that field, and (3) whether the expert's testimony properly relies upon and/or utilizes the principles involved in the field.[133] The testimony submitted by the State appears to meet these requirements, and appellant has submitted nothing in rebuttal. Point of error fifteen is overruled.

### E. Challenges to the Death Penalty

In points of error sixteen through twenty-six appellant raises challenges to the Texas death penalty scheme that we have already rejected. For each, we find it sufficient to set out appellant's claim and to footnote a case or cases in which the claim was rejected. In point of error sixteen, appellant alleges that the "10/12 rule" violates the Eighth and Fourteenth Amendments of the United States Constitution.[134] In point of error seventeen, appellant alleges that the future dangerousness inquiry results in the arbitrary and disproportionate imposition of the death penalty in violation of the Eighth Amendment of the United States Constitution.[135] In point of error eighteen, appellant argues that the future dangerousness scheme violates the Texas constitutional proscription against cruel *or* unusual punishment.[136] In point of error nineteen, appellant complains that article 37.071

---

[133] *Nenno v. State*, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998).

[134] *Smith v. State*, 297 S.W.3d 260, 278 (Tex. Crim. App. 2009); *Ladd v. State*, 3 S.W.3d 547, 574 (Tex. Crim. App. 1999).

[135] *Green v. State*, 912 S.W.2d 189, 195 (Tex. Crim. App. 1995).

[136] *Anderson v. State*, 932 S.W.2d 502, 509 (Tex. Crim. App. 1996).

is unconstitutional for a number of reasons: because the jury is given discretion to consider what it decides to be mitigating,[137] because the term "probability" in the future dangerousness issue dilutes the State's burden of proof,[138] because the mitigation special issue requires the defendant to disprove that a death sentence is warranted,[139] because the instructions result in confusing and conflating the future dangerousness and mitigation issue inquiries,[140] and because prosecutors are conferred with standardless and unfettered discretion to seek the death penalty.[141] In points of error twenty through twenty-two, appellant alleges that the jury charge improperly failed to define the terms "probability," "personal moral culpability," "moral blameworthiness," "criminal acts of violence," and "continuing threat to society."[142] In point of error twenty-three, appellant alleges that Article 37.071, section (2)(e) is unconstitutional because it does not assign a burden of proof to the mitigation question in sentencing.[143] In point of error twenty-four, appellant challenges the constitutionality of Article 37.071, sections 2(e) and (f), arguing that the statute improperly shifts the burden of proof to the defense to offer mitigating evidence to outweigh the evidence of moral culpability.[144] In point of error twenty-five, appellant alleges that the requirement that the jury find the probability of future

---

[137] *Whitaker v. State*, 977 S.W.2d 595, 599-600 (Tex. Crim. App. 1998).

[138] *Jones v. State*, 843 S.W.2d 487, 496 (Tex. Crim. App. 1992).

[139] *Busby v. State*, 990 S.W.2d 263, 272 (Tex. Crim. App. 1999).

[140] *Luna v. State*, 268 S.W.3d 594, 609-10 (Tex. Crim. App. 2008).

[141] *Id.* at 608.

[142] *Id.* at 609.

[143] *Smith*, 297 S.W.3d at 277.

[144] *Busby*, 990 S.W.2d at 272.

dangerousness beyond a reasonable doubt violates the Eighth and Fourteenth Amendments of the United States Constitution.[145]  In point of error twenty-six, appellant alleges that the lethal injection protocol used by Texas is unconstitutional.[146]  These issues have previously been considered and rejected by this Court.  It is also sufficient to dispose of such claims "by recognizing that the trial court submitted a charge consistent with applicable state statutes, which have withstood numerous constitutional challenges."[147]  Points of error sixteen through twenty-six are overruled.

We affirm the judgment of the trial court.

Delivered: June 16, 2010
Publish

---

[145]  *Jones*, 843 S.W.2d at 496.

[146]  *Smith*, 297 S.W.3d at 277 (claim not ripe for review on direct appeal).

[147]  *Saldano v. State*, 232 S.W.3d 77, 107 (Tex. Crim. App. 2007).