

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

### NO. AP-76,809

---

### Ex parte MICHAEL DEE HOWARD, Applicant

---

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### CAUSE NO. 4321-A IN THE 216TH DISTRICT COURT
### FROM GILLESPIE COUNTY

---

**KELLER, P.J., delivered the opinion of the Court in which WOMACK, JOHNSON, COCHRAN and ALCALA, JJ., joined. KEASLER, J., filed a dissenting opinion in which HERVEY, J., joined. PRICE, J., dissented. MEYERS, J., did not participate.**

This is an application for a writ of habeas corpus. Applicant claims, for various reasons, that he received ineffective assistance of counsel at the guilt phase of his aggravated-assault trial. We filed and set the application for submission "to determine whether there is a reasonable probability that the result would have been different at guilt, but for counsels' deficient performance," and directed the parties to brief the issue.[1] The trial court recommended that we grant relief in the form of a new trial. We hold that applicant cannot establish prejudice at the guilt phase of trial, but our resolution of some of his claims leads us to remand the case to the trial court to make findings on

---

[1] *Ex parte Howard*, Order, No. AP-76,809 (Tex. Crim. App. May 23, 2012) (per curiam) (not designated for publication).

whether applicant was prejudiced at the punishment phase by counsel's conduct.

## I. TRIAL

Shortly before midnight on September 4, 2004, Linda Howard, applicant's wife, saw applicant's truck approaching her son's house where she and her daughter were temporarily staying. She announced to the others in the house—her son Bradley Howard, her daughter Britney Howard, and Bradley's girlfriend Cammie Olfers—that applicant had just pulled up to the house. Cammie and Britney hid in a back bedroom. Bradley went to the front of the house where he saw applicant in his truck fidgeting around and going through items. He met applicant at the front door. Applicant asked where Linda was, and Bradley replied, "She's in the house. What do you need?" As Linda came to the door, he stepped aside to let applicant in. Applicant demanded money from Linda, and when she protested, they began to argue. As they argued, Bradley saw a knife-sharpening rod hanging from applicant's belt loop. He grabbed it and asked applicant what it was for. Bradley commented to applicant that the rod had "a good handle on it and it's hard. You could either hit somebody with it or it's got a pointy end and you could stab somebody with it." "Good guess," applicant "snickered."

While Linda was upstairs getting the money applicant demanded, Bradley asked applicant why he was acting this way and what was wrong with him. Applicant began blaming "everything" on the family, saying that it was their fault. He walked to the door as if to leave, but stopped, leaving his hand on the handle. Applicant quickly turned around and swung his arm towards Bradley. Bradley felt a "funny tingling feeling" in his arm and ran to the kitchen to find it cut open and bleeding profusely. According to Cammie and Britney, Bradley screamed, "I can't believe you did that to me!" When he showed applicant what he had done, applicant said, "I'm not through with

you" and charged Bradley with the box cutter that had sliced his arm.  Seeing a large amount of blood in the kitchen and on Bradley, Cammie ran from the dining room and starting slapping applicant.  Applicant cut her hand as she tried to block her face from his blows.  Bradley and applicant fought and struggled down a hallway.  Bradley tried to stay between applicant and Cammie until they reached the computer room at the end of the hallway.  Cammie fell onto a bed, and Bradley jumped on top of her to protect her from applicant.  Applicant plunged the knife into Bradley's back.  Bradley turned around and bear-hugged applicant, and he stuck the knife into Bradley's back again.  Bradley threw applicant to the floor, and Cammie and Linda helped subdue him and pry the knife from his hand.  Cammie took the knife and the sharpening rod and threw them in the bushes outside of the house.  Britney called 911.  While applicant was pinned down, Cammie told applicant that she could not believe that he would do this to people he was supposed to love.  Applicant answered, "Do you really think I care[?]  The person you are and the family you come from, I could care less. You don't think I can find y'all and hunt y'all down?"

Law enforcement officers arrived and arrested applicant.  They also seized the box cutter and the sharpening rod from the bushes.  Both appeared to have blood on them.  EMS took Bradley to the hospital, where he underwent reconstructive surgery on his arm and received stitches for the two back wounds.  As a result of the assault, he could not use his arm for approximately a month and received physical therapy.

The theme of applicant's case-in-chief was that he was a loving father who would never intentionally or knowingly hurt his son but that the effects of many different medications prescribed to treat his ailing emotional and mental health frequently caused him to black out and forget events. Applicant testified that he suffered a blackout on the night of the assault and remembered only "brief

snapshots" of that night. He did not remember getting the box cutter or the sharpening rod, going to Bradley's house, or cutting and stabbing Bradley with the box cutter. Applicant stated that after the assault he had blackouts, memory loss, and hallucinations. He also claimed that, since the change in his medication, he no longer experienced those symptoms. To refute his assertion that he was a loving father, the State cross-examined applicant at length about a large number of prior bad acts and extraneous offenses.

Linda Howard, applicant's wife, testified that she could recall only one incident when applicant could not remember the previous day's events. Otherwise, she testified, applicant did not typically forget events. Linda did say that applicant suffered from severe depression that began as early as 1997. As his depression progressed, he stopped going to work at the auto-repair shop that he owned and managed. Sometimes he had been scared to come out of the house. She testified that applicant's intoxicated-like state was a result of over-medicating or consuming alcohol while taking his medication.

Lieutenant Michael Jennings, the Gillespie County Jail administrator, testified that when applicant first arrived, he "seemed to be all right." Later in the week, however, applicant became "semi-suicidal, tried to strangle himself, put his head in the toilet, and [jail personnel] had to take him to the hospital and finally get him into MH/MR [Mental Health/Mental Retardation] . . . ." According to Jennings, after the hospital visit, applicant was put on different medication and no longer had the tendency to hurt himself. Since the medication change, applicant had been classified as a trusty and was reliably fulfilling those duties.

Sharon Grona, applicant's sister, testified that applicant used to be full of life, but in the last few years he became withdrawn, which worsened as the years went on. Before the medication

change, it was difficult to converse with him, he was unfocused, and he shook. Grona noticed that, with the change in medication, applicant gradually improved while in jail.

A jury found applicant guilty of aggravated assault and assessed a punishment of twenty years' confinement and a $5,000 fine. The court of appeals affirmed the judgment and sentence.[2]

## II. APPLICANT'S CLAIMS

In his application for a writ of habeas corpus, applicant claims that he received ineffective assistance of counsel at trial and on appeal. Applicant claims that his trial counsel were deficient for the following reasons which prejudiced him at trial:

- failing to pursue an insanity defense;

- failing to investigate an insanity defense with the use of experts;

- failing to have a mental-health expert appointed and to use expert witnesses at trial;

- failing to discover witnesses that would support an insanity defense;

- failing to properly file a business-records affidavit under the rules of evidence;

- sponsoring damaging evidence before the jury and calling an adverse witness to testify;

- failing to object to Texas Rule of Evidence 404(b) evidence at trial;

- failing to request a limiting instruction to extraneous-misconduct evidence;

- failing to object to an improper venire shuffle;

- failing to invoke "the Rule" under Texas Rule of Evidence 614; and

- failing to have bench conferences recorded during trial.

We remanded the application to the trial court to make findings of fact and conclusions of law as to

---

[2] *Howard v. State*, 239 S.W.3d 359 (Tex. App.—San Antonio 2007, pet. ref'd).

whether applicant's trial counsel performed deficiently and, if so, whether their deficient performance prejudiced applicant.[3] Pursuant to this Court's order, the habeas judge conducted an evidentiary hearing and entered findings of facts and conclusions of law, which concluded that applicant's trial counsel performed deficiently and prejudice resulted.

## III. ANALYSIS

In analyzing claims of ineffective assistance of counsel under the Sixth Amendment, we apply *Strickland v. Washington*'s two-part framework.[4] An applicant must prove by a preponderance of the evidence that (1) "his counsel's performance was deficient," and (2) "there is a 'reasonable probability'—one sufficient to undermine confidence in the result—that the outcome would have been different but for his counsel's deficient performance."[5] In framing the issue on submission as we have, we have chosen to focus our review on the latter.

When considering a habeas judge's findings of fact, we give "almost total deference" to those findings when they are supported by the record.[6] But we review a trial judge's conclusions of law *de novo*.[7]

### A. Extraneous-Misconduct Evidence Claims

At trial, the State cross-examined applicant about a multitude of instances of extraneous

---

[3] *Ex parte Howard*, Order, WR-73,183-01, at 2 (Tex. Crim. App. December 8, 2010) (per curiam) (not designated for publication).

[4] *Ex parte Chandler*, 182 S.W.3d 350, 353 (Tex. Crim. App. 2005) (citing *Strickland*, 466 U.S. 668, 686 (1984)). *See also Hernandez v. State*, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986).

[5] *Ex parte Chandler*, 182 S.W.3d at 353 (citing *Strickland*, 466 U.S. at 694).

[6] *Ex parte White*, 160 S.W.3d 46, 50 (Tex. Crim. App. 2004).

[7] *Ex parte Brown*, 158 S.W.3d 449, 453 (Tex. Crim. App. 2005).

misconduct. Applicant catalogs the State's evidence of his extraneous misconduct that was admitted without objection, a request for a limiting instruction, or burden of proof instructions on such evidence:

- he has a very bad temper;

- he struck his daughter several times when she was sick with mononucleosis;

- he hit his wife so hard that he knocked her out and left her unable to sleep on that side of her head because of her injuries;

- he hit his wife while she held their children;

- he punctured the tires on his son's car;

- he was drunk, passed out, threw up, and assaulted a party guest;

- he bought lingerie for a female high-school employee;

- he grabbed Bradley by the neck and held him against a wall;

- he punched holes in the walls of his parents' house;

- he shot a hole in the ceiling;

- he stabbed a bag of potato chips while yelling at his wife;

- he threw a bottle of wine and broke it;

- he broke the window of his son's car;

- he went to strip clubs when his family was having financial problems;

- he called his wife a "bitch";

- he wrote an incoherent and rude Valentine's Day note to his wife;

- he wrote an aggressively worded note to his employees at his auto-repair shop;

- he took his wife's clothes outside and ripped them up;

- he drank too much;

- he over-medicated himself;

- he routinely threatened his family with suicide;

- he was verbally abusive to his wife and employees;

- he fought a police officer on a lake trip and bit the officer's hand;

- while attempting to assault Bruce Thiele, he pushed his wife, who fell and struck her chin and knees;

- he threatened his wife and told her that if she called the police, he would take out two officers, one for himself and one for his brother;

- he stabbed Cammie Olfers in the hand as she protected her face and neck;

- he told Linda Howard that he had "just knocked the shit out of Britney and told [Britney] to leave";

- he was referred to anger management;

- he grabbed his son Andy by the neck and picked him up off the dinner table;

- he called his daughter a "bitch"; and

- he tried to pull down his daughter's swimsuit when he was drunk at a lake.

The habeas judge concluded that defense counsels' omissions constituted deficient performance but that this deficient performance did not prejudice applicant.[8]  We agree.

While this evidence was most likely damaging, applicant fails to prove by a preponderance of the evidence that, if counsel had objected to all of the extraneous-misconduct evidence and all of it had been excluded by the trial judge, the outcome at trial would have been different.  The State's evidence was overwhelming and uncontested.  Applicant arrived at Bradley's home armed.  After

---

[8] Findings and Conclusions at 23 ("Trial defense counsel's performance was deficient, but the Court feels that this deficient performance did not prejudice the defense.")

the first swing of the box cutter sliced Bradley's arm, applicant said, "I'm not through with you" and charged Bradley. Applicant also cut Cammie's hand when she came to Bradley's aid. Three witnesses saw applicant stab Bradley with the box cutter or saw the direct results of the attack and struggled to subdue and disarm him. Applicant's statements during and immediately after the attack indicate that he was aware of what he was doing and disregarded the consequences of his conduct. The police recovered the bloody knife that applicant used to assault Bradley. Lastly, Bradley suffered serious bodily injury. In light of all the significant, uncontested evidence at trial inculpating applicant, we are unable to say that the jury would have reached a different conclusion in the absence of the extraneous-misconduct evidence. Similarly, applicant is unable to demonstrate that the jury would have reached a different conclusion had counsel sought and obtained a limiting instruction or a jury instruction on the burden of proof required to be satisfied before the jury could consider the extraneous-misconduct evidence.

Applicant also claims that he was prejudiced by counsel's eliciting damaging evidence before the jury and calling Linda Howard, a witness applicant characterizes as adverse. Applicant points to counsel's cross-examination of Bradley in which he testified about a previous physical fight with applicant in 2003 where applicant spit in his face. In his direct examination of Linda Howard, counsel elicited extraneous-misconduct evidence concerning applicant's violent behavior when Linda was driving applicant to a mental-health appointment. She stated that he was "banging against the glass window, kicking the windshield." Without adding any details, she claimed that he became aggressive toward her and she decided to return home. When asked by trial counsel if applicant ever experienced memory loss, she described one incident where applicant had been drinking and was spotted at a local gas station and then continued on to his auto-repair shop, where he drove into the

roll-up garage door. Applicant claims that trial counsel's elicitation of this testimony prejudiced him because it "established the volatile, violent nature of [applicant]."

The habeas judge concluded that, while counsel's performance was deficient, no prejudice resulted. Consistent with our conclusion of applicant's previous extraneous-misconduct claims, we agree that applicant is unable to establish that prejudice resulted in light of the overwhelming evidence presented at trial.

### B. Venire Shuffle, Invoke "the Rule," and Bench Conferences

The habeas judge concluded that failing to object to the venire shuffle and invoke "the rule" was not deficient performance. Without making a specific finding as to performance or prejudice, the judge also concluded that counsels' failure to have bench conferences recorded was not ineffective assistance. Applicant does not assert these points in his brief before the Court. In his application and memorandum in support, applicant claims that failing to object to the trial court's shuffle prejudiced him "by directly influencing which potential jurors could be selected as jurors in the case" and that failing to invoke the rule resulted in prejudice because it permitted the State's witnesses to directly refute applicant's claim that he was a loving father. As to counsel's failure to have the bench conferences recorded, applicant argues that this prejudiced him because it "allowed the loss of possible errors for review that went to decisions to admit evidence and rule on objections." Applicant is unable to establish that these omissions resulted in prejudice sufficient to change the outcome of the proceeding.

### C. Insanity Defense Claims

The habeas judge concluded that the insanity defense was viable in this case, and that counsel's failure to have mental-health experts appointed and to use expert witnesses in investigating

and presenting an insanity defense was deficient performance. The judge further concluded that, but for this deficient performance, the outcome of the proceeding would have been different. Texas Penal Code § 8.01(a) provides that, "It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong." To be excused from criminal responsibility under this section, the actor must prove insanity by a preponderance of the evidence.[9] Therefore, to prevail under *Strickland*'s prejudice prong, applicant must establish a reasonable probability that the jury would have found (by a preponderance of the evidence) that applicant was insane at the time of the offense.

In support of his insanity-defense claims, applicant introduced testimony from a number of his friends and family members who described, with varying levels of specificity, their perceptions of applicant's behavior. The majority of these witnesses, despite having known applicant for many years, did not witness any bizarre behavior and did not know whether applicant was suffering from any debilitating mental condition. If applicant told them anything about any mental impairment, it consisted of vague statements such as "he had problems" or "he was depressed." Gregory Hagel's testimony, by way of affidavit, was the exception. Applicant told him that he was taking Xanax and Prozac and that he tried mixing the medications with alcohol but stopped because of its effect on him. Hagel noticed applicant's behavior start to change and recalled seeing applicant "walking like a zombie" and standing in his front yard in his underwear or wearing "funky" pants. Hagel did not testify at the evidentiary hearing, and his affidavit did not specify when he witnessed applicant's bizarre behavior.

In addition to Hagel's affidavit, testimony from Sharon Grona and her husband Billy Grona

---

[9] TEX. PENAL CODE § 2.04(d).

was the most specific as to the change in applicant's behavior and mental condition. She stated that applicant's personality started to change in 2001: he was not as social as he once was, it was difficult to talk to him, noise bothered him, and his hands shook. She learned that applicant was prescribed medication, but he would frequently take too much of it. She testified that, on the day after his arrest, applicant was "totally out of it," confused as to what was happening, and crying uncontrollably. Billy Grona, applicant's brother-in-law, stated that applicant was always very social, but that he began to change around 2002, and conversing with him became difficult. Both Sharon and Billy Grona recalled a specific incident of applicant's bizarre behavior. According to the Gronas, one afternoon (sometime between 2002 and the arrest), applicant came outside of his house in his underwear to move a car parked nearby. He went back inside the house to put on pants but returned wearing another pair of underwear over the first pair. After applicant was arrested for the assault, Billy Grona went to applicant's house, where he found the furniture stacked against the house's front windows. Grona also discovered that the back room's glass doors were spray painted with ceiling texturing material.

Roger Glenn, Michael Caldwell, and Michael Wallendorf—the witnesses whom applicant claims counsel should have discovered through investigation—testified at the writ hearing as well. Glenn, applicant's friend since 1989, noticed a change in him too, but believed it was from the exposure to chemicals applicant used on vehicles in his auto-repair business. He did not witness any bizarre behavior, but he felt that applicant was just not the same person he used to know. He did know applicant was on antidepressants. He testified that applicant was frequently absent from work because he was at home lying down.

Caldwell and Wallendorf were Gillespie County Sheriff's Deputies who both worked at the

jail at the time applicant was taken into custody but knew applicant apart from their work at the jail. Caldwell testified that he saw applicant crying in the fetal position in the corner of his cell. After applicant was taken to the emergency room and had his medication changed, Caldwell noticed substantial improvement in his demeanor. Wallendorf corroborated Caldwell's account, but he also observed that applicant was disoriented, talking to himself, hallucinating, hiding under a mattress, and trying to kill himself by putting his head in the toilet. In Wallendorf's affidavit, he stated, "It was my belief that he was initially over[-]medicated and clearly was not himself."

The medical records included in the habeas record indicate applicant was seeing doctors for depression several years before the assault. The habeas judge did not make fact findings detailing applicant's mental status before the assault but found only that applicant "had a history of mental-health issues."[10] The record does support that applicant was diagnosed in 2003 and 2004 with dysthymic disorder, generalized anxiety disorder, and major depressive disorder severe without psychotic behavior. Applicant was prescribed a number of medications, including, but not limited to, Prozac, Wellbutrin, Xanax, Paxil, and Ambien. During the course of his treatment, his medications and the dosages were changed often. The medical records, which span nearly 150 pages, do not indicate that any of applicant's doctors were concerned with his sanity or appreciation of right and wrong. None of applicant's doctors testified as to his mental condition.

Applicant relies on psychiatrist Dr. Jack Ferrell's expert opinion to support his position that insanity was a viable defense and should have been raised at trial. From his review of applicant's medical records and conversations with applicant, his friends and family, and a few of applicant's doctors, Dr. Ferrell concluded that, at the time of the assault, applicant suffered from a severe mental

---

[10] Findings and Conclusions at 2.

disease or disorder—major depressive disorder with major anxiety, a significant sleep disorder, and paranoia—which most likely prevented applicant from conforming his conduct to the law and impaired his ability to appreciate right and wrong. In his affidavit, Dr. Ferrell notes applicant's increasingly frequent misuse and abuse of his medication in the months before the assault occurred and acknowledges that this could have contributed to his conduct. Dr. Ferrell states that applicant is "using as much as 3-4 times his prescribed dosage of Xanax to calm himself down." Dr. Ferrell also noted that applicant's "sudden and remarkable improvement" after his medication regime was altered (and after the assault), "gives resounding testimony of the impact of drugs that may have been harmful to him and contributory to his conduct versus those results of simply prescribing and using medication that was appropriate for his needs." His affidavit further observes, "At times, when not on his medications, [applicant] did not have any problems . . . ."

While in custody, applicant was taken to Hill Country Memorial Hospital. According to the hospital records dated September 13, 2004, applicant took a large amount of Xanax before committing the assault. After having taken Xanax and Ambien for eight years, his use abruptly stopped when he went to jail. The records further indicate that applicant reported hallucinations and anxiety attacks after two days in jail. He denied ever hallucinating before. The treating physician's clinical impression of applicant's condition was primarily benzodiazepine withdrawal and secondarily "acute psychosis (BZD [benzodiazepine] withdrawal vs. acute schizophrenia vs. schizoaffective disorder." The medical records from the Hill Country Community MHMR Center also strongly indicate that excessive Xanax contributed to applicant's actions the night of the assault. The records note that applicant "took 5 [Xanax] (1 every 30 minutes)" on the day of the assault. They also contain a notation that he "binged" on Xanax and consumed an amount that could

intoxicate. This is echoed elsewhere in the records: "Mr. Howard admits to taking as much as 5 Xanax the day he attacked his family [and] admitted he had done this several times in the past month." The doctor concluded that "benzodiazepine and Ambien abuse appear significant."

Applicant has not established a reasonable probability that the jury would have found that he was insane at the time of the offense, and therefore he does not establish a reasonable probability that the result of the guilt phase of his trial would have been different. The trial and habeas records are replete with evidence of applicant's misuse of prescription drugs in contrast to the minimal evidence that applicant relies upon to claim that insanity was a viable defense at trial. Rather, the sum of the evidence suggests it is more likely that, on the night of the assault, applicant was intoxicated as a result of over-medicating himself with Xanax and Ambien and that his bizarre behavior in jail was attributable to medication withdrawal. However, "[v]oluntary intoxication does not constitute a defense to the commission of a crime," and "Texas Penal Code § 8.04(a) bars the use of evidence of voluntary intoxication to negate the culpable mental state of a crime."[11] Because the record does not support a finding that applicant was prejudiced at the guilt phase of trial by counsels' failure to raise an insanity defense, it also does not support a finding of prejudice at the guilt phase with respect to his three related insanity-defense claims—failing to have mental-health experts appointed, failing to investigate an insanity defense with experts, and failing to properly file a business-record affidavit to introduce applicant's medical records.

Nevertheless, the same statute that prevents intoxication-induced insanity from being a defense at the guilt stage of trial permits such insanity to be considered in mitigation of punishment:

---

[11] TEX. PENAL CODE § 8.04(a); *Davis v. State*, 313 S.W.3d 317, 328-29 (Tex. Crim. App. 2010)

> Evidence of temporary insanity caused by intoxication may be introduced by the actor in mitigation of the penalty attached to the offense for which he is being tried . . . . When temporary insanity is relied upon as a defense and the evidence tends to show that such insanity was caused by intoxication, the court shall charge the jury in accordance with the provisions of this section.[12]

Trial counsel requested a jury instruction regarding voluntary intoxication at the punishment stage of trial, but that instruction was denied, and the denial was upheld on appeal because the record did not contain evidence to raise the issue of insanity.[13] Our reason for rejecting applicant's guilt-stage claim—that applicant's insanity was the result of voluntary intoxication—logically implicates the issue of whether counsel was ineffective at the punishment stage.

Applicant received the maximum punishment—twenty years—for a second-degree felony,[14] and he has no prior convictions. The State introduced evidence of quite a few extraneous offenses, while applicant introduced evidence designed to show that he was a kind and loving father who was simply unable to control himself while on prescription drugs and alcohol.[15] Although the habeas judge's recommendation that applicant receive a new trial arguably includes a recommendation that applicant should receive a new punishment hearing, we remand the case to the habeas judge for

---

[12] *Id.*, § 8.04(b), (c).

[13] *Howard v. State*, 239 S.W.3d at 365. In his direct appeal, applicant also raised an ineffective-assistance claim based upon counsel's failure to introduce records that applicant abused Xanax and had taken it near the time of the offense, but the court of appeals determined that applicant failed to introduce any evidence that applicant was temporarily insane as a result. *Id.* at 367. Through habeas, applicant has expanded the record to show that such evidence could have been discovered and introduced. *See Ex parte Torres*, 943 S.W.2d 469, 475 (Tex. Crim. App. 1997) (rejection of ineffective-assistance claim on direct appeal does not bar relitigation of claim on habeas corpus to the extent that applicant seeks to gather and introduce additional evidence not contained in the direct-appeal record).

[14] *See* TEX. PENAL CODE § 12.33(a).

[15] *See Howard*, 239 S.W.3d at 367-68.

findings of fact on whether applicant was prejudiced with respect to the issue of punishment.

Delivered: September 11, 2013
Do not publish