

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

Nos. 04-18-00701-CR & 04-18-00702-CR

Serge L. **HIDEN**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 379th Judicial District Court, Bexar County, Texas
Trial Court Nos. 2017CR10972 & 2017CR10973
Honorable Dick Alcala, Judge Presiding

Opinion by:    Luz Elena D. Chapa, Justice

Sitting:    Sandee Bryan Marion, Chief Justice
Rebeca C. Martinez, Justice
Luz Elena D. Chapa, Justice

Delivered and Filed: January 15, 2020

AFFIRMED

Serge L. Hiden was convicted by a jury of two counts of aggravated assault with a deadly weapon and one count of unlawful possession of a firearm by a felon. On appeal, Hiden contends the trial court erred in admitting a detective's opinion regarding whether Hiden acted in self-defense and including an instruction on provoking the difficulty in the jury charge for the aggravated assault offenses. Hiden also contends trial counsel rendered ineffective assistance of counsel by failing to request an instruction on the defense of necessity in the jury charge for the offense of unlawful possession of a firearm by a felon. We affirm the trial court's judgment.

## BACKGROUND

The evidence at trial presented two versions of the events that transpired at Hiden's house on February 28, 2017. On that date, Hiden shot Edward Anthony in the mouth and also seriously injured Anthony's brother, Trinidad Sarabia. Others present during the altercation were Klarissa Isabel Martinez (Anthony's girlfriend), Brian Moseley, Lawrence Griffin (Hiden's best friend), Desiree Saenz (Griffin's girlfriend), Victoria Guerra, and Chrystal Chavez. The testimony was conflicting regarding whether Guerra was Hiden's girlfriend or if he just provided her support and a place to live while her mother was in prison. Chavez remained outside after she and Sarabia drove to Hiden's house in response to a phone call from Anthony. Anthony, Moseley, Guerra, and Griffin were all living with Hiden in the house.

Sarabia and several of the witnesses were working for Hiden's construction company. The business office for the construction company was located inside the house, and Hiden had video surveillance cameras installed inside and outside the house. Inside the house, the surveillance cameras recorded the living room but not the kitchen, the office area behind the kitchen, or the bedrooms. Outside the house, the surveillance cameras recorded the driveway and the side door to the house which entered into the kitchen. The surveillance cameras captured portions of the altercation but not Anthony's shooting or the subsequent confrontation between Sarabia and Hiden which occurred in the kitchen and entryway to Hiden's office. Video recordings from the surveillance cameras were admitted into evidence.

All of the witnesses consistently testified that Hiden arrived home and began arguing with Anthony and Martinez and demanded that they leave the house. Hiden, Guerra, Griffin, and Moseley testified Hiden was angry because he discovered Anthony was selling drugs from the house. Their testimony was conflicting as to whether Hiden knew Anthony sold drugs. Anthony testified he worked for Hiden selling drugs in exchange for Hiden providing him a place to live.

The surveillance camera video shows Hiden, Anthony, and Martinez arguing inside the house. At one point, the video shows Moseley stepping in front of Anthony and Martinez while Griffin holds Hiden back from them. Eventually everyone exits the house, and the witnesses testified the argument continued outside. It is not clear at what point Sarabia arrived during the argument. The video also shows Guerra witnessing parts of the altercation. Shortly before the shooting, the video shows Hiden entering the house followed by Griffin and Guerra. After they walked to the back part of the house, the video shows Anthony and Sarabia entering the house followed by Martinez and Moseley, and they also walk to the back part of the house.

Anthony, Martinez, and Sarabia testified that after Anthony and Sarabia were at the entryway to Hiden's office, Hiden retrieved a gun and ordered Sarabia to leave. Hiden, Griffin, Guerra, and Moseley testified Hiden did not have a gun. The witnesses testified and the video shows Moseley escorted Sarabia through the side door of the house before Anthony was shot. Griffin testified that after Sarabia was escorted outside, Anthony returned to his bedroom and retrieved a gun. Several witnesses testified Anthony owned guns and often carried a gun with him, and photographs from the crime scene showed a rifle on top of Anthony's bed. The video shows Griffin entering the living room and watching Anthony and Martinez walking from Anthony's bedroom to the kitchen before the shooting. The video also shows Anthony and Martinez returning to the kitchen prior to the shooting, and Griffin and Hiden testified Anthony was carrying a gun. The poor quality of the video and the fact that it only showed Anthony's right hand, however, required the jury to decide if Anthony had a gun in his hand. Anthony and Martinez testified Hiden shot Anthony with the gun Hiden was holding after Anthony entered the kitchen. Hiden, Griffin, and Guerra testified Hiden struggled with Anthony over the gun in Anthony's possession. The video briefly shows Hiden in the living room in possession of the gun immediately before Anthony enters the living room after being shot and exits the house through the front door. Around the

same time Anthony exited, the video shows Sarabia entering the house and quickly walking into the kitchen area followed by Anthony. Sarabia testified he struggled with Hiden over the gun, and Hiden pistol-whipped him and fired the gun causing bullets to graze his head during the struggle. Hiden admitted he used the gun to hit Sarabia but testified the gun did not discharge during his struggle with Sarabia. The video then shows Sarabia stumbling away from the house. The video also shows Anthony and Martinez entering and exiting the house a few times before EMS and police arrived. Finally, the video shows Hiden exiting and entering the house a few times through the side door and exiting the house through the front door before the police arrived.

After the altercation, Sarabia was missing a tooth and suffered a fractured cheek bone, a dislocated shoulder and collar bone, and required staples to close two head wounds. Moseley and Griffin drove away from the scene before law enforcement arrived and did not provide statements.

Additional evidence was introduced that challenged the credibility of Hiden's testimony. First, responding Officer Cathryn Pelkey testified Hiden kept looking away and trying to listen to other people's conversations while she questioned him. She described Hiden's answers as very conflicting and testified Hiden did not state he acted in self-defense, but did tell her he did not know what happened. A video recording from Officer Pelkey's body cam was admitted into evidence. Officer Pelkey testified she did not observe any injuries to Hiden who is shown on the video; however, a photograph of Hiden's hand was admitted into evidence showing one of Hiden's fingers was injured and bleeding.

In addition to Officer Pelkey's testimony, Saenz, who remained outside during the altercation, is shown in the surveillance video walking down the driveway. Saenz testified she walked down the driveway, tracking the progress of the altercation inside the house, and, through the office window, she saw Hiden pointing the gun. Saenz testified she ran and hid behind a tree in the backyard when she saw Hiden pointing the gun, and later saw Hiden hide the gun in the dirt

behind an apartment that was adjacent to Hiden's house. Law enforcement recovered the gun that was used in the altercation from the area Saenz described. Hiden testified he gave the gun to Martinez and Anthony when they asked for it after the shooting and denied hiding the gun.

Both Hiden and Sarabia tested positive for gunshot residue, but Anthony did not. Furthermore, although Hiden invoked his right to counsel and was not interviewed by authorities, portions of a video recording of phone calls Hiden made while in the interview room were admitted into evidence. During the telephone conversations, Hiden stated the surveillance cameras would show he did not have any weapons. Hiden also stated he had been tested for gunshot residue and knew there was no gunshot residue on his hands.

Finally, two shell casings were recovered from the kitchen and photographs of bullet holes in the walls were admitted into evidence. When confronted with the evidence of the shell casings, Hiden testified that was not possible and stated people were in and out of the house before it was searched.

Based on the evidence presented, the jury found Hiden guilty of two counts of aggravated assault with a deadly weapon and of being a felon in unlawful possession of a firearm. The trial court sentenced Hiden to twenty-five years' imprisonment on each of the aggravated assault counts and ten years' imprisonment for the offense of unlawful possession of a firearm by a felon.

## DETECTIVE LANDRUM'S OPINION

In his first issue, Hiden contends the trial court erred in allowing Detective Landrum to testify regarding whether he believed Hiden was acting in self-defense. The State responds the issue is not preserved for our review.

Detective Landrum testified he had been a detective for eight years and a patrol officer for ten years before becoming detective. Detective Landrum later testified as follows:

Q. Okay. Thank you.

So you made — did you make your determination to arrest Mr. Hiden based on the interviews and on what you observed in the house?

A. I did.

Q. Okay, Now, you've been a detective for a long time. You've been an officer for a long time. Have you dealt with cases of self-defense.

A. Yes.

Q. Okay. And can you tell me, in your experience, what do people who commit self-defense typically do after the fact?

A. Normally, they're very forthcoming. They —

[Defense counsel]: I'm going to object to relevance, Your Honor.

[Prosecutor]: Your Honor, this is —

THE COURT: Overruled.

Q. (By [prosecutor]) You can answer.

A. Normally, they are the ones that contact the police because they feel that they need to get everything out in the open. They usually don't hide — attempt to hide any types of evidence.

Q. Oh, keep going. Is there anything else that you've observed them to typically do?

A. I think that's usually most of it.

Q. Okay. Do you know who called the police in this case?

A. I believe it was the — the victims.

Q. Okay. Now, you mentioned in your experience what people typically do after they've committed a crime that they're justified in using self-defense. And in this case, why did you believe that self-defense was not justified?

A. Well, I — in this instance, I don't believe that Mr. Hiden was in danger or fear for his life. The victims were never indicated to have any weapons. It was a shoving match. There was no serious bodily injury present on Mr. Hiden. It didn't appear that any serious bodily injury was — was gong to take it to that matter. He's the one that introduced the weapon into this — what was — before that argument and the shoving match.

"Preservation of error is a systemic requirement on appeal." *Ford v. State*, 305 S.W.3d 530, 532 (Tex. Crim. App. 2009). "If an issue has not been preserved for appeal, neither the court of appeals nor [the Texas Court of Criminal Appeals] should address the merits of that issue." *Id*.

"To preserve error for appellate review, the complaining party must make a specific objection and obtain a ruling on the objection." *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002). In order to meet the specificity requirement, a party must "let the trial court know what he wants and why he feels himself entitled to it clearly enough for the judge to understand him." *Vasquez v. State*, 483 S.W.3d 550, 554 (Tex. Crim. App. 2016). "[A] general or imprecise

objection will not preserve error for appeal unless the legal basis for the objection is *obvious* to the court and to opposing counsel." *Id*. (internal quotation marks omitted). Finally, the issue on appeal "must comport with the objection made at trial." *Wilson*, 71 S.W.3d at 349. When the issue on appeal does not comport with the trial objection, "nothing is presented for review." *Hallmark v. State*, 541 S.W.3d 167, 171 (Tex. Crim. App. 2017).

In this case, no objection was made to Detective Landrum's testimony in response to his opinion regarding the reasons he believed Hiden did not act in self-defense. Instead, the relevancy objection was only made with regard to Detective Landrum's testimony about actions taken after an incident by those who act in self-defense. Accordingly, Hiden's issue on appeal does not comport with the objection made at trial and is not preserved for appellate review.

Even if the objection had been preserved, the admissibility of a lay witness's opinion "is within the discretion of the trial court and will not be reversed absent an abuse of discretion." *Davis v. State*, 313 S.W.3d 317, 349 (Tex. Crim. App. 2010). Under Rule 701, a lay witness may testify to opinions which are "(a) rationally based on the witness's perception; and (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue." TEX. R. EVID. 701. "The personal experience and knowledge of a lay witness may establish that he or she is capable, without qualification as an expert, of expressing an opinion on a subject outside the realm of common knowledge." *Osbourn v. State*, 92 S.W.3d 531, 537 (Tex. Crim. App. 2002). "[A] police officer's personal knowledge may come from his past experience." *See Roberson v. State*, 100 S.W.3d 36, 39 (Tex. App.—Waco 2002, pet. ref'd).

Here, Detective Landrum testified he had been a detective for eight years and was experienced in cases of self-defense. His opinion regarding whether Hiden acted in self-defense was based on this experience, the information he obtained from interviewing several witnesses at the scene, and his observations at the scene, including his search of Hiden's house. Because

Detective Landrum's opinion was rationally based on his perceptions and his personal experience, the trial court did not abuse its discretion in admitting the testimony. *See James v. State*, 335 S.W.3d 719, 726 (Tex. App.—Fort Worth 2011, no pet.) (question whether defendant's self-defense assertion made sense in light of police officer's observations admissible under rule 701).

Hiden's first issue is overruled.

### PROVOKING THE DIFFICULTY

In his second issue, Hiden contends the trial court erred in including an instruction on provoking the difficulty in the jury charge.

"[A] defendant may forfeit his right to self-defense if he provokes the attack." *Elizondo v. State*, 487 S.W.3d 185, 196 (Tex. Crim. App. 2016). "The rule of law is that if the defendant provoked another to make an attack on him, so that the defendant would have a pretext for killing the other under the guise of self-defense, the defendant forfeits his right of self-defense." *Id*. at 196-97 (internal quotation marks omitted) An instruction on provoking the difficulty is required when sufficient evidence is presented on the following three elements:

> (1) that the defendant did some act or used some words that provoked the attack on him,
>
> (2) that such act or words were reasonably calculated to provoke the attack, and
>
> (3) that the act was done or the words were used for the purpose and with the intent that the defendant would have a pretext for inflicting harm upon the other.

*Id*. at 197. "This standard does not require the judge to encroach on the jury's role as factfinder" or "to assess the credibility or strength of the evidence." *Id*. "It simply requires the judge to decide whether evidence has been presented that *could* support a jury's finding of all three elements of provocation beyond a reasonable doubt." *Id*.

Under the first element, "there must be some evidence from which a rational jury could find beyond a reasonable doubt that some act or words of the defendant actually caused the attack

on him." *Id*. at 199. "In addition, acts or words directed at a third party may likewise provoke a difficulty." *Id*. In this case, the jury viewed a video showing the argument between Hiden, Anthony, and Martinez, and Griffin physically restraining Hiden during part of the argument. The jury also heard testimony about the altercation and Hiden's aggression. The trial court could have decided that this evidence could support a jury's finding that Hiden's acts or words provoked the attack on him.

Under the second element, some evidence must show "the defendant's actions or words were reasonably calculated to provoke the attack." *Id*. "[A]n act is reasonably calculated to cause an attack if it is reasonably capable of causing an attack, or if it has a reasonable tendency to cause an attack." *Id*. (internal quotation marks omitted). "Moreover, words alone may provoke a difficulty if they are clearly designed to do so." *Id*. The trial court also could have decided that the video and the witnesses' testimony could support a jury's finding that Hiden's actions and words were reasonably capable or had a reasonable tendency to cause an attack.

"The third element supporting a provoking-the-difficulty instruction requires that there be some evidence from which a rational jury could find beyond a reasonable doubt that the act was done, or the words were used, for the purpose and with the intent that the defendant would have a pretext for killing the victim." *Id*. at 200. "Even though a person does an act, even a wrongful act, which does indeed provoke an attack by another, if he had no intent that the act would have such an effect as part of a larger plan of doing the victim harm, he does not lose his right of self-defense." *Id*. (internal quotation marks omitted). "A defendant's intentions can be determined from his words, acts, and conduct, occurring before, during, or after the provocation." *Id*. at 201. "The acts of provocation alone can carry the inference of intent, and [the defendant's] actions during or after the provocation can illuminate his intent. *Id*. at 202. A defendant's "prior acts can also give

character to what he said or did at the time of the [offense], which can aid in both explaining [the defendant's] words or acts and determining his intent." *Id*.

The trial court could have decided the jury could have inferred from the evidence that Hiden entered the house after aggressively arguing with Anthony and Sarabia in an effort to lure them to follow him, while he had the opportunity to retrieve his gun. The trial court could also have decided the jury could have found that Hiden's action in retrieving the gun upon entering the house showed his intent to harm Anthony and Sarabia. The trial court could have further decided the jury could have found Hiden retrieved the gun to provoke Anthony and Sarabia into attacking him as a pretext for harming them. Finally, the trial court could have decided the jury could have found Hiden's intent was shown by his actions in hiding the gun. Accordingly, the trial court could have decided the record contained some evidence from which a rational jury could have found beyond a reasonable doubt that Hiden's actions and words were intended to provoke Anthony and Sarabia as a pretext for shooting them.

Hiden's second issue is overruled.

INEFFECTIVE ASSISTANCE

In his third issue, Hiden contends trial counsel was ineffective in failing to request an instruction on the defense of necessity in the jury charge for the offense of unlawful possession of a firearm by a felon.

"To prevail on a claim of ineffective assistance of counsel, the [appellant] must show that counsel's performance was deficient and that the deficient performance prejudiced the defense." *Prine v. State*, 537 S.W.3d 113, 116 (Tex. Crim. App. 2017) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "Unless appellant can prove both prongs, an appellate court must not find counsel's representation to be ineffective." *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). "In order to satisfy the first prong, appellant must prove, by a preponderance of the

evidence, that trial counsel's performance fell below an objective standard of reasonableness under the prevailing professional norms." *Id*. "To prove prejudice, appellant must show that there is a reasonable probability, or a probability sufficient to undermine confidence in the outcome, that the result of the proceeding would have been different." *Id*.

"An appellate court must make a strong presumption that counsel's performance fell within the wide range of reasonably professional assistance." *Id*. (internal quotation marks omitted). "In order for an appellate court to find that counsel was ineffective, counsel's deficiency must be affirmatively demonstrated in the trial record; the court must not engage in retrospective speculation." *Id*. "Trial counsel should generally be given an opportunity to explain his actions before being found ineffective." *Prine*, 537 S.W.3d at 117. "In the face of an undeveloped record, counsel should be found ineffective only if his conduct was so outrageous that no competent attorney would have engaged in it." *Id*. (internal quotation marks omitted). The Texas Court of Criminal Appeals "has repeatedly stated that claims of ineffective assistance of counsel are generally not successful on direct appeal and are more appropriately urged in a hearing on an application for a writ of habeas corpus." *Lopez*, 343 S.W.3d at 143.

In this case, the record is silent as to the reason trial counsel did not request an instruction on the defense of necessity. Given the conflicts in the state of the evidence, we cannot conclude no competent attorney would have decided not to ask for the instruction. Because we presume trial counsel's actions were reasonable given the silent record, we need not decide whether the record would support a finding of prejudice if trial counsel's performance had been deficient.

Hiden's third issue is overruled.

## CONCLUSION

The trial court's judgment is affirmed.

Luz Elena D. Chapa, Justice

DO NOT PUBLISH